# STATE OF CONNECTICUT *v.* JAMES PINDER
## (SC 15750)

Callahan, C. J., and Borden, Berdon, Norcott, Palmer, McDonald and Peters, Js.

Argued February 18—officially released August 24, 1999

*Eugene J. Riccio*, special public defender, with whom, on the brief, was *Margaret M. Wynne*, for the appellant (defendant).

*Ellen A. Jawitz*, deputy assistant state's attorney, with whom, on the brief, were *Walter D. Flanagan*, state's attorney, and *David M. Holzbach*, assistant state's attorney, for the appellee (state).

*Opinion*

NORCOTT, J. After a jury trial, the defendant, James Pinder, was found guilty of the crime of murder in violation of General Statutes § 53a-54a.[1] The trial court rendered judgment in accordance with the jury verdict and sentenced the defendant to a term of imprisonment of forty years. The defendant appeals from the judgment of conviction, claiming that the trial court improperly: (1) concluded that the defendant's inculpatory statements were not obtained in violation of his right not to incriminate himself;[2] (2) concluded that, under the

---

[1] General Statutes § 53a-54a provides in relevant part: "Murder. (a) A person is guilty of murder when, with the intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude conviction of, manslaughter in the first degree or any other crime. . . ."

[2] After making the incriminating statements that are the subject of this appeal, the defendant was interrogated further by different police detectives who gave him *Miranda* warnings. See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Thereafter, the defendant made two unequivocal requests for counsel that were ignored by the detectives who continued to interrogate him. The defendant subsequently signed

circumstances of the case, the defendant's statement—"What about a public defender?"—was not an equivocal request for counsel that, under article first, § 8, of the Connecticut constitution, required that the police clarify the statement before resuming questioning; (3) concluded that the defendant's inculpatory statements were made voluntarily; and (4) deprived the defendant of his right to a fair trial by coercing the jury into continuing their deliberations over the objections of both the state and the defendant. We affirm the judgment of the trial court.

The record discloses the following facts. The defendant and the victim, Brian Altvater, had been close friends for twelve years, and both were twenty years old at the time of the victim's death. For the preceding two years, they had lived as roommates in the basement of the victim's parents' home. The two men often sought employment at the same jobs, and had talked of starting a computer company together. Until shortly before the victim's death, both worked as salesmen at an area car dealership.

On the night of November 15, 1994, the victim's mother discovered the body of her deceased son in his bedroom in the basement. The victim was found on his bed with the covers pulled up to his chin and his arms at his side, underneath the covers. The victim had suffered a gunshot wound to the back of the head.[3] A .22 caliber semiautomatic pistol and its holster were found

---

a written confession to the murder. The trial court granted the defendant's motion to suppress the written confession pursuant to applicable federal and state authorities, including *Davis* v. *United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994), *Miranda* v. *Arizona*, supra, 475, and *State* v. *Anonymous*, 240 Conn. 708, 720–23, 694 A.2d 766 (1997). The suppression of the written confession is not an issue in the present appeal.

[3] An autopsy conducted at the office of the chief medical examiner determined that the wound to the back of the victim's head was an entrance wound. The state police could not determine conclusively from this evidence, however, whether the death was a suicide or a homicide.

on the combination headboard/bookcase of the victim's bed. A shell casing was lodged in the ejector port of the gun, indicating that the gun had been fired. The victim's father contacted the police, and an officer immediately responded to the Altvater home. That officer subsequently was followed by members of the state police major crime squad.

The police conducted an initial investigation at the scene, and interviewed both of the victim's parents. Upon learning that the defendant shared a residence in the basement with the victim and likely would have been the last person to have seen the victim alive, a member of the state police located the defendant by telephone at his mother's house at 1 a.m. An interview was scheduled, and two detectives went to the defendant's mother's house and spoke with him for approximately one hour and fifteen minutes at 4:30 a.m. During that interview, the defendant provided a written statement concerning the events of the past day.

During the day on November 16, 1994, one of the detectives requested that the defendant come to the state police Troop A barracks for another interview, based on certain details in the defendant's statement, particularly a discrepancy between the defendant's time line of the events of the preceding morning and the time line given by the victim's father. At the conclusion of that interview, because the detectives believed that the defendant was withholding information about the victim's death, they asked the defendant if he would be willing to take a polygraph examination in order to support his statements. The defendant agreed to do so. An unexpected opening in the testing schedule at the state police polygraph unit enabled the defendant to be scheduled for a polygraph examination the next day. On November 17, 1994, the defendant again met the two detectives at the Troop A barracks. He was given the option of driving to the polygraph unit in his own

car or with the detectives, and he elected to travel with the detectives. During the drive, the two officers and the defendant had a casual conversation about computers.

At the polygraph unit, the defendant underwent a preliminary interview with a secondary polygraph examiner, followed by the polygraph examination itself with the primary examiner. As a result of the defendant's performance on the polygraph examination, the two examiners believed that he had been deceptive in his statements that he knew nothing about the victim's death. During postexamination questioning to determine the nature of the perceived deception, the defendant made the admissions at issue in this appeal, wherein he confessed to shooting and killing the victim. The defendant subsequently was charged with the murder of the victim. Additional facts will be provided as necessary.

I

The defendant moved to suppress several incriminating oral statements that he had given to the polygraph examiners on November 17, 1994, claiming that his federal and state constitutional rights had been violated.[4] Relevant to this appeal, the defendant raised three grounds for suppression: (1) the statements were made without the assistance of counsel and, therefore, in violation of the defendant's *Miranda* rights; (2) the defendant's inquiry—"What about a public defender?"—constituted either an unequivocal request for counsel or an equivocal request for counsel that the polygraph examiners were required to clarify before

---

[4] The trial court noted in its memorandum of decision concerning the motion to suppress that it "has heard the motion to suppress under federal constitutional principles only. The defendant's claim under the state constitution has not been accompanied by an independent analysis necessary to invoke such consideration." Similarly, on appeal, although the defendant refers to the state constitution, he offers no separate and independent analysis. We, therefore, confine our analysis to the federal constitution.

continuing to question him; and (3) the defendant's statements were not made voluntarily. The trial court rejected all three claims concluding: (1) that the defendant was not in custody and, therefore, that a fifth amendment right against self-incrimination had not yet attached; (2) that the defendant's inquiry—"What about a public defender?"—did not constitute an unequivocal request for counsel; and (3) that the defendant's statements were made voluntarily. We agree with the conclusions of the trial court.

At the suppression hearing and the trial, the following evidence was presented.[5] The defendant's first contact with the police occurred at 1 a.m. on November 16, 1994, approximately four hours after the victim's body had been discovered. After the victim's parents informed the police that the defendant was the victim's roommate, the police telephoned the defendant at his mother's house. This call was made both to notify the defendant of the victim's death, and to request an interview with him in order to investigate the circumstances of the victim's death. The police did not consider the defendant to be a suspect at this time, and had not reached a conclusion as to whether the death was a suicide or a homicide.

Between 4:30 a.m. and 5 a.m. on November 16, members of the state police went to the defendant's mother's house and spoke with the defendant. Although upset regarding the death of his friend, the defendant was cooperative, coherent and appeared to be very intelligent over the course of the interview. He both volunteered information and answered questions, as the

---

[5] "We may consider the testimony adduced both at the trial and at the suppression hearing when determining the propriety of the trial court's ruling on a motion to suppress a confession. *State* v. *Toste*, 198 Conn. 573, 576, 504 A.2d 1036 (1986)." *State* v. *Lapointe*, 237 Conn. 694, 704 n.15, 678 A.2d 942, cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996).

police sought to obtain as much background information as possible regarding the victim who, at that time, was considered to be a possible suicide. The defendant signed a written statement at the conclusion of the interview, which detailed, among other things, his contact with the victim over the course of the preceding day.[6]

After obtaining the defendant's written statement, Detective James Bleidner, one of the detectives who had interviewed him, had concerns about the time line of events as described by the defendant. Specifically, the defendant had stated that he left the residence at 8:20 or 8:25 a.m. on November 15, although the victim's father had told the police that he had passed the defendant in his car near the home at 8:55 a.m. The police also recovered a towel from the defendant's bedroom that was owned by the victim's family and not normally

---

[6] The written statement signed by the defendant provided in relevant part: "I've been friends with [the victim] for the last twelve years. The last two years, I've been living on and off at [his] parents house in Sherman.

"[The victim] and I have worked together at various jobs and business ventures in the past. Presently, I worked at—Torrington Honda and [the victim] works at Soft Town a computer store in Danbury Square Mall. I'm usually off on Tuesdays and I drive [the victim] to work on those days. Sometimes [the victim] works [12 p.m.] to 8 p.m. and other times from 9:30 [a.m.] to [6] p.m.

"The last time I saw [the victim] was this morning [November 15, 1994] when I got up at 8:10 a.m. [The victim's] alarm clock woke me up. I . . . asked [the victim] if he was getting up and he said, 'Yeah, Yeah' but, he didn't get up. I asked him again if he was going to get up and go to work but he said . . . he didn't feel too good and said, 'I don't want to put up with Leonard's bullshit.' Leonard is [the victim's] boss at work.

"I told him I was going to take . . . my mother to work and when I left he was still lying in bed and his alarm clock was still ringing. I left at about 8:20 to 8:25 a.m.

"Normally on Tuesdays, if I'm not taking [the victim] to or from work . . . I'll stay at my mother's that night. Besides, sometimes, when I get back to his parents from my work, [the victim] is in a bad mood and I don't feel like dealing with him. I was . . . somewhat surprised that I didn't hear from [the victim] during the day because he usually calls me for some reason or other."

used by the defendant. Later that afternoon, on November 16, 1994, Bleidner asked the defendant to go to the state police barracks to discuss the case further. At this time, the victim's death was still considered a possible suicide. Besides clarification of inconsistencies in the defendant's statement, the police also sought to ask further general questions about whether the defendant thought the death could have been a suicide. The defendant agreed to meet them again. The police met the defendant in Danbury and he followed them in his own car to the barracks for the interview, which lasted approximately one hour. Toward the conclusion of the interview, while discussing his friend's death, the defendant became emotional and began crying.

At the end of that meeting, Bleidner remained concerned about the time line discrepancies, told the defendant that he thought that the defendant was not being completely truthful, and offered the defendant the opportunity to take a polygraph examination to support his statement. Bleidner told the defendant at the time of this offer that he had the right to refuse to take the polygraph examination. The defendant agreed to take the examination, indicating that he had done a study on polygraphs in school and was familiar with them. Although the defendant stated that he was willing to take a polygraph test that afternoon, an appointment was not available at the polygraph unit at that time. Accordingly, an appointment was made for the following day.[7]

On November 17, 1994, the defendant returned in his own car to Troop A. He appeared calm and no longer seemed upset. Bleidner offered the defendant the option of either following the detectives in his own car

---

[7] Normally, there is a backlog of approximately six weeks for scheduling polygraph examinations. In this case, however, a cancellation on November 17, 1994, made time available for members of the polygraph unit to conduct an examination of the defendant.

to the polygraph unit, or driving with another detective and Bleidner. The defendant elected to leave his car at Troop A and drive to the polygraph unit in an unmarked state police car with the two detectives. During the course of the ride, the detectives did not discuss the case with the defendant. Instead, Bleidner inquired about computers, as the defendant was well informed about the topic, and the occupants of the car had a casual discussion about that subject.

Upon arrival at the polygraph unit, the defendant was brought to the waiting room on the first floor, while the two detectives went upstairs to the polygraph unit to meet with the polygraph examiners. The waiting room is downstairs near the front door of the building, separate from the polygraph unit, and its door does not lock. The defendant was not restrained in any way while in the waiting room.

Detective Joseph Palombizio of the polygraph unit, the secondary examiner for the purposes of the polygraph exam, then entered the waiting room and introduced himself to the defendant. He gave the defendant a background form to fill out,[8] and returned upstairs to discuss the subject matter of the polygraph with the two detectives. Bleidner provided the examiners with the written statements available at the time, including one from the defendant, as well as a case synopsis of the investigation and the areas they sought to have addressed in the polygraph examination.

After the defendant completed the form, Palombizio returned to the waiting room to bring the defendant upstairs to the interview room. The interview room is

---

[8] The primary function of the background form is to bring to light any health conditions or recently ingested chemical substances that would interfere with the accuracy of the test. The form normally takes approximately ten to fifteen minutes to fill out, and completion is required of each person who takes a polygraph examination.

approximately six feet by eight feet, with a desk, two chairs and no windows. The door does not lock. Both the interview and the polygraph examination rooms are equipped with video recording equipment.[9] Palombizio began the interview portion of the polygraph by informing the defendant of his *Miranda* rights, and ensuring that the defendant understood both that he was not required to take a polygraph, and that he could leave the test at any time if he so desired.[10] This review of

[9] Every specific issue polygraph examination conducted at the polygraph unit, as opposed to employment examinations of prospective state police employees, is audio and videotaped, and each examinee is informed of that fact at the start of the interview.

[10] Questions asked by Palombizio during the interview and the responses by the defendant provide in relevant part:

"Q. OK. First of all before we get started, I have to tell you that in the state of Connecticut, a polygraph examination has to be something you want to do of your own free will and volition. That means no one can force you to be here, no one can force you to take this test, and nobody could have made any type of illegal promises or threats to get you here. Are you here of your own free will and volition?

"A. I was told it was regulation.

"Q. It's a regulation?

"A. That is was—that it was normal procedure.

"Q. Normal procedure is to ask people to take a polygraph in this type of a case. Any type you have a—any time you have a suspicious type of a death, probably the quickest way that people can be eliminated is through the process that you're going to be going through this morning.

"A. Yeah.

"Q. You gotta' realize that what we can do in probably two hours or two hours and twenty minutes will probably take an investigator maybe two, three days of work—legwork, what we call knocking on doors, and we can do it probably in about two hours or two hours and twenty minutes. So, I think the regulations that they meant was that as part of routine course, polygraph exams are asked of people that are involved in [this] type of a case. But, as far as actually saying that you're forced to take this, or there's a state law that says [the defendant] has to take this, no, that's not—that's not the truth at all.

"A. OK.

"Q. So, you're here of your own free will and volition. That's all I'm asking you.

"A. Well, I—

"Q. Nobody grabbed you by the throat, and nobody grabbed you by the hair and pulled you down here.

## rights is provided to every individual taking a polygraph

"A. No.

"Q. All right.

"A. No, but I'm real nervous about this.

"Q. That's good. That's good. If you were telling me . . . that you were not nervous right now, I would start to get nervous. We're gonna' talk about all of that.

"OK. So, what I'd like to do for you, then . . . is just read the bottom paragraph to you. I'm going to ask you to follow along. If you don't understand something, by all means, just ask me to explain it for you. And then, I need your printed name here, written signature, and time we're starting is 9:27 a.m.

" 'I . . . do voluntarily, on November 17th, 1994, agree to take a polygraph examination knowing the following: first of all, a lawyer or a third person cannot be present during the test. However, if you wish to talk to a lawyer or a third person, the polygraph examination will be interrupted or stopped to allow you that right.

" 'All conversations during the polygraph examination will be audio and video recorded, and the results of the polygraph examination will be made available to the proper authorities.'

"Now, everybody always asks us, 'Who are the proper authorities?' So I'll tell you. In this case, here . . . you're one of the proper authorities so we will tell you our opinion before you leave here this morning. We also will tell Detective Bleidner, who's working on the case, what our opinion is concerning this matter. So, those are the two proper authorities concerning your polygraph examination here this morning.

"If you've understood everything I've explained, I need your printed name, written signature, and the time we're starting is 9:27 a.m. . . .

"Now, one of the formalities we also have to follow with you . . . is I have to advise you of what's called your *Miranda* Rights and Constitutional warnings. You probably heard this many times on police shows in the movies or on TV. It's just a formality that we go through here whether you be a victim, a witness, a suspect, an accused or somebody the police are just trying to clear. At this point during the process, everybody gets read their rights so that's what I'm gonna' do with you. I'm gonna' read the top paragraph now, and I'd like you to follow along, and once again, if you don't understand something, by all means, just ask me.

" 'First of all, you have the right to remain silent. If you talk to any police officer, and to get that cleared up for you, you understand, I'm a state police officer.'

"A. Yeah.

"Q. Now, my partner who's gonna' do the test, see I'm not the primary examiner here this morning. I'm here just to find out whether or not [the defendant] is going to be medically able to take that test. So, Detective Joe Schaedler will be actually running the primary examination. But, the only point I want to make there with you is he's also a state police officer. So

examination conducted by the state police whether that

therefore, anything that you say can be used against you in court. You have the right to consult with a lawyer before you are questioned, and you may have him or her with you during the questioning. I always like to ask people at this time, do you have a lawyer in this case?

"A. No, I don't.

"Q. Why not?

"A. I can't afford one to tell you the truth.

"Q. OK.

"A. [What about a public defender?]*

"Q. OK. Well, you got to realize to be offered a public attorney, there has to be some type of a court involvement, and at the moment, there's no—no type of court action going on so you don't have to be too concerned with that. If you do want some type of legal advice and there's any type of court action, then you will be afforded legal counsel at that time. That's the next statement.

" 'If you cannot afford a lawyer, one will be appointed for you if you wish before answering any questions.' And, just to clarify that for you . . . you understand we don't appoint lawyers here, polygraph as I mentioned, just a court type of procedure.

"A. Yeah.

"Q. 'If you wish to answer questions, you have the right to stop answering at any time.' And that's probably the most important right I've read to you . . . . That means that at any point during the process, whether it be the beginning, the middle or even near the end, if you don't feel like being here, you don't feel like taking the test anymore, just say, 'Hey, look, I don't feel like doing this. Please stop the procedure.' You're free to go.

"And lastly, 'You may stop answering questions at any time if you wish to talk to a lawyer, and you may have him or her with you during the questioning.'

"And, the only thing I want to clarify in that last statement is that under no conditions at all do we do what is called a three person polygraph test. In other words, the only people that will be sitting in that testing room is going to be [the defendant] and Detective Joe Schaedler. I'm not gonna' be in there, Jim Bleidner's not gonna' be in there, nobody else will be in there. Which means if you were to have an attorney and want to take it with an attorney present, they would be allowed to sit in that waiting room downstairs and you could go back and forth as much as you wanted. But, actually sitting in right there in that room next to you, we don't do tests under those conditions at all.

"If you understood everything I've explained, and you want to continue on under these conditions, then I just need your written name there . . . and we're all set to start you up."

*Due to the quality of the recording of the interview, the defendant's statement concerning a public defender was partially unintelligible. The state and defense counsel agreed, therefore, that they would assume him to have asked, "What about a public defender?"

individual is a witness, a victim or a suspect. After having these rights explained to him, the defendant signed the form containing the notice of rights and the agreement to take the polygraph exam. Palombizio then reviewed the defendant's background form responses with the defendant, both to confirm the accuracy of the written responses and to ensure that he properly could be tested.

Over the course of the preliminary interview, Palombizio also inquired whether the defendant understood the nature of the questions he would be asked, ensuring that the defendant understood that they would pertain to the death of the victim, whether the death was criminally caused, and whether the defendant played any part in the victim's death. The defendant indicated that he understood the nature of the questions that would be posed to him.

When the approximately one-half hour long interview was completed, the defendant asked to use the bathroom. Palombizio showed him where the bathroom was located across the hall, and afterwards brought the defendant to the polygraph examination room. The polygraph room is ten feet by fourteen feet, contains a desk and two chairs, and has no windows. There is no lock on the door. The room also contains a two-way mirror.

Once they were in the polygraph room, Palombizio again reminded the defendant that he was free to leave at any time, and that "just because you're here doesn't mean you have to stay here." He also pointed out and explained the presence of the two-way mirror, and the fact that it was a soundproof examination room.[11]

---

[11] Palombizio identified the main purpose of the two-way mirror as being a security measure so that the safety of the examiners could be ensured when they test convicted prisoners because the examiners are unarmed when they conduct the tests. He also indicated that he did not know whether anyone would be watching the defendant's interview through the mirror.

Palombizio inquired if the defendant had any remaining questions for him, and gave the defendant a brief summary of what to expect from Detective Joseph Schaedler of the polygraph unit, the police officer conducting the polygraph test. The defendant expressed that he was nervous, but he did not have any questions, and Palombizio left the examination room.

The next phase of the polygraph examination was conducted by Schaedler. Schaedler entered the polygraph room, introduced himself to the defendant, and began the second portion of the interviewing process. He first explained to the defendant generally how the polygraph machine works.[12] He also informed the defendant that they would need to discuss the details of how

The purpose of the soundproof walls is to ensure that discussions taking place in the examination room are not overheard in the hall outside it.

[12] At this time, Schaedler also falsely suggested that the results of polygraph examinations were admissible in court. Questions asked by Schaedler during the interview and the responses by the defendant provide in relevant part:

"Q. The physiological things that are happening inside of you we're recording are affected when we tell a lie. And, that's what we're really doing. That's why it's called a lie detector. OK? Well, probably the best name to give this instrument is a truth verifier because when somebody comes in and they tell me the whole truth, I'm able to verify what they've told me. And, that's the only time a polygraph truly works because if you have the truth, now you know what you got, now you know what you have to deal with.

"If somebody is not involved in a crime and that's the truth, [they have] no knowledge, they—you know, they weren't involved at all, that's what's gonna' come out on the paper, that's what you can verify through the test so the police or the courts know that, OK, this person is not involved. We can—we can move into a different area.

"A. I thought that lie detector tests weren't court admissible.

"Q. OK. That's not true. I don't know if my partner explained that to you. What you're going to do here today is gonna' be used by the courts. How it's used by the courts depends on the prosecutor and the judge. OK? I testify, on an average, six to eight times a year. I just testified a couple weeks ago up in Hartford court on a father who was accused of molesting his daughter. Those things happen, and yes, it's used, otherwise you wouldn't be here. OK? But, again, how it's actually gonna' be used, that's gonna' be up to the judge to decide, it's gonna' be up to the prosecutor and also to a defense attorney.

"I guess the point I'm trying to make for you with that is if you're not

the defendant might have been involved in the victim's death in order to construct appropriate questions for the examination itself. Schaedler reiterated at this point in the interview that "[n]obody can be forced to take a polygraph. It's something they have to want to do voluntarily." In the course of this discussion with the defendant, Schaedler also reminded him that if he did fail the test, "[t]here's a very good chance you may be arrested for [the victim's] death. Do you understand that?" The defendant replied, "Yes, I do." The detective proceeded to explain in further detail how a person's physiological responses to questions are recorded by the polygraph machine.

involved in [the victim's] death in any way, shape or form, that means you're telling the truth when you're answering today's questions, then it's gonna' tell the police and the courts that you're not involved. Therefore, you're not going to be arrested for something you didn't do. OK. But, if you're involved, OK, if you did murder [the victim], and even if you talk about that with me here today, and we discuss the reasons why, what's gonna' happen in court I can't say, but obviously what you and I talk about is gonna' be used there.

"If you lie about it, if you murdered [the victim] and you fail today's test, it's gonna' be used against you. It's gonna' be able to be used by the police to obtain search warrants, to obtain arrest warrants. It's gonna' be used by the judge in deciding, 'Well what should I do with this person? What kind of sentence should he get? Did he cooperate . . . ?' "

At the suppression hearing, Schaedler explained that his intent in making these statements was to suggest "if somebody has done something wrong, and they admit what they did . . . if the motive is explained, it explains to the judge when it comes time for sentencing." "If he is a serial killer . . . then the judge will probably take a much harder line with somebody rather than if it was an emotional type thing that can be explained through . . . other reasons. But the only person who would know would be somebody who was involved, and if that, in fact, was [the defendant], then it would be in his best interest to explain the motive behind the action."

He further testified that he never promised the defendant leniency. In explanation of the implied falsehood that the polygraph result itself was admissible, he explained that such a statement is necessary because it will be easier for an examinee who is deceptive to pass the polygraph exam if he believes the results are not admissible. Indicating its admissibility, therefore, puts the examinee in the necessary emotionally stimulated state required to ensure an accurate polygraph reading. This falsehood also acts to convince a truthful person that he has reason to take a polygraph examination.

Schaedler and the defendant then discussed a number of topics related to the victim's death in preparation for the actual examination. These areas included the defendant's relationship with the victim generally, the state of their friendship prior to the shooting, the time line of the defendant's activities on the morning of the victim's death, and the defendant's access to and use of guns in the home. They also discussed the death itself, including the defendant's views on whether it was a suicide, and if not, who was the most or least likely person to have killed the victim.[13] As a product of this discussion, Schaedler developed a set of ques-

[13] Schaedler also informed the defendant that there was a Federal Bureau of Investigation (FBI) profile that fit the circumstances of this case, and which suggested that the victim was killed by someone who knew him. The purported profile was of someone who had assaulted others before, and who told lies. The last two questions of the specific issue examination relate to this profile. See footnote 14 of this opinion for the text of the related questions.

At the suppression hearing, Schaedler testified that the admittedly fictional profile is included in the examination process as a control. He explained its use as follows: "Polygraph is the test of focus and it's an emotional recorder so, if [the defendant] came in and was not involved in this crime, he was being truthful when [he said] he had no knowledge or involvement with [the victim's] death, he would, theoretically, react to those [FBI profile control] questions. . . . They create somewhat of a paradox for the person and that's where you're going to see a truthful person react. There will be reactions from anybody during a polygraph test and what the design is for the truthful people is for them to react on control questions, deceptive [people] will react to the relevant questions. . . . [I]t's required by [the American Polygraph Association] standards if you're going to run a proper test. A specific acquisition test, there would have to [be] control questions as well as relevant questions that are covered. So, to run a proper polygraph test by everyone['s] standards, you have to have control questions. . . . [Y]ou're setting up a scenario where a truthful person has [to] be able to vent their emotions somewhere during the test or else everyone is going to fail a polygraph if you're only going to ask relevant questions. The FBI profile is a way of establishing that question. Another technique would be a guilt complex type question. If I were testing you on a larceny that if you stole something before that, that may bother you on this test. So, it's just a technique that's used in order for someone to have credibility as to why that question is even asked."

tions that would constitute the examination.[14] Schaedler read these to the defendant, asking him first to answer them while not monitored by the polygraph machine as a means of allowing him to become familiar with the questions that would be asked. Before progressing with the actual test itself, Schaedler asked the defendant whether there were any problems, and the defendant answered in the negative. The defendant requested to use the bathroom, and then to smoke a cigarette, but he agreed not to leave the room at that time, as Schaedler explained that smoking was not permitted immediately prior to the test.[15] A moment later, as

[14] The defendant's answers were consistent each time he was given the set of questions over the course of the examination. The ten specific issue exam questions asked by Schaedler, along with the defendant's responses, were as follows:

"Q. Do you live in the United States?

"A. Yes.

"Q. Did you live with [the victim]?

"A. Yes.

"Q. Do you know for sure who murdered [the victim]?

"A. No.

"Q. Did you murder [the victim]?

"A. No.

"Q. Before 1994, did you ever hurt anyone?

"A. No.

"Q. Were you present when [the victim] was shot?

"A. No.

"Q. Is your first name James?

"A. Yes.

"Q. Did you ever say you were truthful when you knew you were telling a lie?

"A. No.

"Q. Did you fire the bullet from the gun which killed [the victim]?

"A. No.

"Q. Have you now told me the absolute, 100 percent truth about [the victim's] death?

"A. Yes."

[15] Questions asked by Schaedler and the responses by the defendant provide in relevant part:

"Q. OK. Any problems?

"A. I gotta' go to the bathroom.

"Q. Yeah, you gotta' go?

"A. Actually, can I have a smoke first?

Schaedler prepared the polygraph equipment for the first test, he again asked whether the defendant had any questions. The defendant inquired about returning the next day to take the examination, and Schaedler indicated that the defendant could not return the next day due to the already full schedule at the polygraph unit, but that he could reschedule for a number of weeks in the future.[16] After the conclusion of this discussion and further instructions concerning the polygraph, Schaedler prepared to record the defendant's responses using the machine for the first time. Before beginning, he asked the defendant, "OK. You all set?" The defendant responded, "Yeah." Schaedler then read the ten

---

"Q. Nope. That I can't let you do.

"A. No? OK.

"Q. The reason for that is the nicotine in the tobacco—right now, you've had about an hour and a half to detox from what was in your system so we don't want to put anymore in.

"A. All right.

"Q. Did you use the bathroom when you came up?

"A. Yeah."

[16] Questions asked by Schaedler and the responses by the defendant provide in relevant part:

"Q. Do you have any questions for me? Anything we've talked about, anything else you need to add, or anything else you need to talk—to tell me.

"A. If at a point I feel uncomfortable, can I come back tomorrow?

"Q. Well, unfortunately not because we're booked right through until December 23rd.

"A. Jesus.

"Q. Um—we got almost a six week backlog. As it was, we got you fit in because we had somebody cancel for this morning, things like this. All I could say is, tell me the whole truth. I know it's gonna' be difficult, but you want to get this behind you now. By having to wait another week or two weeks—

"A. No.

"Q. What ends up happening is, you know, you just kinda' let things—let things go, and you really don't want that to happen. You're gonna' be sitting on pins and needles until you come back to get it over with.

"A. That's true.

"Q. This is your opportunity to get it all resolved right here and now. OK? What you want to do is sit in a nice upright position, you want to keep both feet flat on the floor, you want to let the arm rests support your arms."

questions to the defendant, whose responses were consistent with his previous statements to the police.

After the first test, Schaedler explained to the defendant that a control examination was required in order to gauge the defendant's results, and that the control test[17] would be conducted by Palombizio. Schaedler then left the room. Palombizio entered the room, explained the nature of the control test to the defendant, and then conducted two control tests.[18] Upon completion of the second test, Palombizio inquired, "How do you feel about finishing this?" The defendant responded, "Let's do it." Palombizio then explained the polygraph readings produced during the control tests to the defendant, and told the defendant that he would leave to get Schaedler, who would complete the specific issue test. Palombizio then left the polygraph room, and Schaedler entered shortly thereafter to conduct the final tests to be monitored by the polygraph machine. He inquired whether the defendant wanted to change or add anything to what he had stated previously, and the defendant replied, "I'm all set." Schaedler conducted the specific issue examination twice, the first time asking the defendant to respond verbally to the questions

[17] Palombizio testified at the suppression hearing that the control test, or "known peak of tension test," is a neutral test performed to establish that the examiner is in fact getting responses from the examinee, and to illustrate for the examinee that the examination is working properly on him. The control test used in this instance consists of the defendant selecting a card from a deck, and remembering the number on the selected card. The examiner then reads the number from each card, and the examinee is instructed to deny that the number is correct in every instance.

[18] In the first test, the defendant told Palombizio that he had picked card number three, and Palombizio questioned this statement, as the polygraph results suggested that the defendant had picked card number five. Palombizio conducted a second test, the results of which suggested that the defendant had picked card thirteen. The defendant stated that he had in fact selected card thirteen for the second test.

Schaedler, who witnessed the administration of the control test through the two-way mirror, saw the defendant select card number five, which confirmed Palombizio's interpretation of the polygraph results.

and the second time asking him simply to listen to the questions and not to respond verbally. Shortly thereafter, Schaedler told the defendant that he would leave the room to review the charts, and he left accordingly.

Upon returning to the room a few minutes later,[19] Schaedler stated to the defendant: "I had Joe Palombizio analyze 'em. Because of the seriousness of this—the exam, we even had the supervisor analyze 'em. Everybody analyzed 'em independently. Everything is great on a numerical basis. . . . [T]here's no doubt: you murdered [the victim]. The scary thing is . . . the why, and I'm afraid that when you leave here, just with me writing a report that says you murdered him or you're involved in his death, without some type of explanation."[20] The defendant responded by asserting that the victim had wanted the defendant to kill him because the victim could not kill himself, and that the victim also wanted the defendant to kill himself afterwards. Schaedler continued to question the defendant about the details of this scenario, stating at one point: "You

---

[19] It is standard procedure for the examiner to return to the examination room and share his or her opinion with the examinee.

[20] Schaedler's purpose as a polygraph examiner was to verify the information the defendant provided in his statement to the police. Where an examinee's polygraph results indicate deception in response to relevant questions, the second objective of an examiner is to determine the nature of the deception through interviewing techniques.

At the suppression hearing, Schaedler testified that "there are a lot of reasons why somebody can fail a test short of being involved in the murder. It's been my experience over the years that people fail exams when they haven't been the actual perpetrator of the crime, but they have some knowledge of it or they're lying about some other aspect of it." He further testified: "[M]y goal is to find out what is the truth and that is up for [the defendant] to tell me . . . as being truthful and I'm gauging that by verbal and nonverbal behavior and until he says, I don't want to talk to you anymore then I'm going to continue to talk to him until I feel what he's telling me is the truth. . . . I'm going to address everything. From worst case scenario until least case scenario. I don't know what the truth is. My job is to sit there and talk to someone until they tell me what the truth is and I'm comfortable, by assessing the verbal and nonverbal behavior."

probably got angry and out of anger did this, but he didn't ask you to kill him."[21] The defendant continued to insist he was pushed by the victim into killing him. Schaedler conducted further questioning on this point,[22]

---

[21] Questions asked by Schaedler and the responses by the defendant provide in relevant part:

"Q. [W]e got to talk, we get to the truth now. You've . . . taken a big step. You're more than halfway there, but if we don't get to the whole truth, no one's gonna' believe this.

"A. He asked me to. He did ask me to. He had threatened my life. He—

"Q. Why didn't you just walk away?

"A. I don't know. I was gonna' go to my mother's. I didn't want to walk away from him 'cause I've always been [inaudible]

"Q. You said his dad is dyin' of cancer?

"A. He said he couldn't stand it. He couldn't stand it.

"Q. They, if nobody else, need to know what the truth is and what happened to their son.

"A. I'm so sorry. I'm so sorry.

"Q. I know you're sorry. I know you loved [the victim]. And—

"A. [He] was gonna' kill me. [He]—I can't hurt myself. I can't—

"Q. We've got to get to the whole truth here. We got to get to the whole truth. You can't leave here without it. You can leave—what I'm trying to say is you owe it to yourself, you owe it to [the victim], you owe it to [his] parents to let the truth come out."

Schaedler explained the reason for this line of questioning was that "the parents have a right to know what the truth is and if you have that information, it [would] be nice for them to hear what that information is. . . . I'm attempting to present a logical atmosphere for the person to tell me what the truth is, and if it's that the parents have a right to know that . . . that's what I'm going to use."

[22] Schaedler continued to urge the defendant to tell the complete truth. Questions asked by Schaedler and the responses by the defendant provided in relevant part:

"Q. You started. You've taken the biggest step. You've admitted killing [the victim]. But, until you come all the way with it with what's happened, it's gonna' feel like a dream.

"A. Oh, my god.

"Q. And, you're not gonna' be able to get it behind you to get on with your life. What I'd like to do at this point, give you a few minutes to collect yourself, I'd like to go talk to Detective Bleidner and explain to him how you did with your test, and what you've told me afterwards. But, he's the man who is going to be handling the investigation. You've got to sit down and talk to him.

"But, I'm gonna' tell you right now, if you lie to him, and he catches you in a lie down the road, he can't help you. He can only help you if you're

finally asking him, "So, he never asked you to kill him, did he?" The defendant responded, "No."[23] After a few more moments of discussion in which Schaedler

truthful with him. If you lie to him about what you've told me about [the victim], if this was an accident, if [the victim] pushed you and you got angry, and that's what happened, that can be explained. But, if he didn't ask you to—to kill him, you're saying right now he asked you to help him commit suicide.

"A. He pushed me into it.

"Q. And, that's what you want Detective Bleidner to tell [the victim's] parents, that [he] committed suicide with your help.

"A. No. I'm so sorry.

"Q. Is that what you want his parents to hear?

"A. [inaudible]

"Q. His parents deserve to hear the truth. They can only hear that from you, and that means you've got to stand up and be the man. . . . This is something where emotions got out of control, hey, that can be explained. That happens. That's reality. Is it right? No, but it's reality. But . . . you've got to speak the whole truth 'cause nobody can help you unless you help yourself, and you gotta' do that by being truthful.

"Now, I'm gonna' go talk to Detective Bleidner, but I don't want to go in there and tell him that this is what [you] said only to find out I look like a fool. You've got to be truthful with me. Then, I can help you with Detective Bleidner, and he can help you."

In explanation of these statements and what "help" he was referring to, Schaedler testified that "Detective Bleidner was the detective who had brought him to the unit. He was the one involved in the investigation so, what assistance he could render as far as working with the prosecutor with bail that's—again, I'm not the one conducting the investigation so, how the arrest if the arrest was going to be made—those types of situations . . . . [I]f people know what the truth [is] they're better able to help you."

[23] By this point in the interview, the defendant was crying. Schaedler testified at trial that "there are brief portions where, yes, I would say he's not totally in control. But most of the crying that we viewed, in my opinion, was not legitimate tears; not real crying, but it was a controlled effort. . . . It took some time for the truth to fully come out. That was a deliberate act on [the defendant] as to what I'm going to say and when I'm going to say it; how much trouble am I going to get in by saying this; how much trouble am I going to get in by saying that. That was supported by the nonverbal behavior we talked about, the—the crying, but it's an artificial cry because there's no real tears. There were times when, yes, he did cry and there were real tears, but most of what we saw, in my opinion, was not hysteria or legitimate emotion. It was—it's common to see in people that are being deceptive."

became confident that he had obtained the truth,[24] he ceased questioning and offered the defendant the option of going to another room to have a cigarette.[25] This concluded the examiners' interview with the defendant.

Both the state and the defense offered the testimony of medical experts who had examined the defendant. The defense's expert, James Merikangas, a physician who specializes in neurology and psychiatry, testified that the defendant is of normal intelligence, but has a "reduced ability to deal with life" and that under stress, he becomes dependent on others for the majority of decisions in his life. Merikangas identified the defendant as having been diagnosed with dependent personality disorder. He also concluded that the defendant suffers from organic personality disorder with mixed features, including dependence. The conclusion that the disorder was organically based was associated with a skull fracture that the defendant had suffered when he was fifteen years old. Regarding the defendant's ability to "say no" to the police, it was Merikangas' opinion that the defendant was unable to make a cognitive decision whether to cooperate with the police as soon as he was "in custody." Merikangas based his determinations

---

[24] Schaedler testified that "toward the end of my interview there was a noticeable change in his behavior, his nonverbal behavior, where he became more relaxed, when he finally related his involvement."

[25] Questions asked by Schaedler and the responses by the defendant provide in relevant part:

"Q. Let me go get Detective Bleidner. OK? Want a drink or something?
"A. No.
"Q. Tell you what, you want a cigarette?
"A. Yeah, I want one.
"Q. Why don't you come across the hall with me. I can't let you have one in here 'cause we do testing in here, but across the hall, I'll let you get one. OK?
"A. OK."

Palombizio testified that in his experience, he had witnessed a number of examinees who confessed to committing crimes leave the polygraph unit after their interview was concluded, and they were not arrested until a later time.

about the defendant's behavior while he was with the examiners on his belief that the defendant was in custody beginning "when he was told he would have to take a lie detector test."[26]

The state presented the testimony of Scott Grove, a psychiatrist who concluded that the defendant's prior skull injury produced no emotional or physical consequences. He also identified the defendant as suffering from dependent personality disorder of mild to moderate intensity.

## A

The defendant first contends that the trial court improperly admitted certain inculpatory oral statements that he had made to detectives at the polygraph unit on November 17, 1994, on the grounds that the statements were obtained in violation of his fifth amendment[27] right against self-incrimination under *Miranda* v. *Arizona*, 384 U.S. 436, 475, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). We conclude that the trial court properly concluded that the defendant was not in custody at the time that the inculpatory statements were made and, therefore, his *Miranda* rights had not yet attached. We reject the defendant's claim.

"*Miranda* and the due process clause affect the admissibility of a defendant's statements differently. Due process requires only that a defendant's statements be uncoerced; the *Miranda* rules condition the admissibility of an uncounselled statement taken during police

---

[26] Merikangas defined custody to be when the defendant "was in the custody of the police whether or not he was under arrest. He was in a place where he could not just get up and walk out or at least he didn't know he could do that." Merikangas' conclusion that the defendant did not know that he could get up and walk out was based on the fact that the defendant did not in fact get up and walk out.

[27] The fifth amendment to the United States constitution provides in relevant part: "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."

interrogation on the state's demonstrating that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. [Id.] *Miller* v. *Dugger*, 838 F.2d 1530, 1537 (11th Cir. 1988). An officer's obligation to administer *Miranda* warnings attaches only where there has been such a restriction on a person's freedom as to render him in custody. *Stansbury* v. *California*, 511 U.S. 318, 321, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994) (per curiam), quoting *Oregon* v. *Mathiason*, [429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977)] (per curiam); see *Illinois* v. *Perkins*, 496 U.S. 292, 296, 110 S. Ct. 2394, 110 L. Ed. 2d 243 (1990)." (Internal quotation marks omitted.) *State* v. *Lapointe*, 237 Conn. 694, 724–25, 678 A.2d 942, cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996).

"A person is in custody only if, in view of all the surrounding circumstances, a reasonable person would have believed he was not free to leave. *United States* v. *Mendenhall*, 446 U.S. 544, 553–54, 100 S. Ct. 1870, 64 L. Ed. 2d 497, reh. denied, 448 U.S. 908, 100 S. Ct. 3051, 65 L. Ed. 2d 1138 (1980); *State* v. *Hoeplinger*, 206 Conn. 278, 287, 537 A.2d 1010 (1988). As stated by the United States Supreme Court in *California* v. *Beheler*, [463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983)], '[a]lthough the circumstances of each case must certainly influence a determination of whether a suspect is "in custody" for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest. [*Oregon* v. *Mathiason*, supra, 429 U.S. 495].' " *State* v. *Pittman*, 209 Conn. 596, 608, 553 A.2d 155 (1989); see also *Stansbury* v. *California*, supra, 511 U.S. 324.

The defendant bears the burden of proving custodial interrogation. *State* v. *Pittman*, supra, 209 Conn. 606. As to the scope of our review of the trial court's findings

concerning custodial interrogation, we have discerned that some ambiguity exists in our prior cases. Therefore, we take this opportunity to clarify the proper scope of appellate review under these circumstances. We begin by noting the established rule that "[t]he trial court's determination of the historical circumstances surrounding the defendant's interrogation are questions of fact; id.; which will not be overturned unless they are clearly erroneous. *State* v. *Young,* 191 Conn. 636, 652, 469 A.2d 1189 (1983); *State* v. *Ostroski,* 186 Conn. 287, 292, 440 A.2d 984, cert. denied, 459 U.S. 878, 103 S. Ct. 173, 74 L. Ed. 2d 142 (1982); see Practice Book § [60-5]." *State* v. *Lapointe,* supra, 237 Conn. 725.

Although we give deference to the trial court concerning these subsidiary factual determinations, such deference is not proper concerning the ultimate legal determination of custodial interrogation. We are guided in this area by the decisions of the United States Supreme Court. As we stated in *State* v. *Atkinson,* 235 Conn. 748, 759 n.17, 670 A.2d 276 (1996), "[o]ur review of the issue of custody comports with the United States Supreme Court's recently enunciated two part test for determining custody. 'Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. . . . The first inquiry, all agree, is distinctly factual. . . . The second inquiry, however, calls for application of the controlling legal standard to the historical facts. *This ultimate determination, we hold, presents a "mixed question of law and fact" qualifying for independent review.' Thompson* v. *Keohane,* [516 U.S. 99, 112–13, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995)]. This analysis is similar to the one that we have always applied. We first examine the trial court's conclusion regarding the historical facts in order

to determine whether it is clearly erroneous. We next conduct an independent review in light of the totality of the circumstances by scrupulously examining the record to determine if an application of the law to the facts leads us to conclude that the defendant was in custody. In contrast with the Supreme Court, however, we have never expressly labeled this second determination as a mixed question of law and fact. We note that the court applied this label in interpreting 28 U.S.C. § 2254 (d), which affords a presumption of correctness to all issues of fact, in order to escape from the constraints of that presumption with respect to the ultimate issue of custody." (Emphasis added.) We have reaffirmed this standard of plenary review of a trial court's determination of custodial interrogation in subsequent cases. See, e.g., *State* v. *Johnson*, 241 Conn. 702, 719, 699 A.2d 57 (1997).

While mindful of the propriety of an independent determination on the ultimate issue of custodial interrogation, we nevertheless have been somewhat unclear in labeling our scope of review in these types of cases. In *State* v. *Atkinson*, supra, 235 Conn. 759, although citing *Thompson* v. *Keohane*, supra, 516 U.S. 112–13, as support for the proposition that the ultimate determination of custody requires independent review by the appellate court, we nevertheless continued to state that "[i]n order to determine the ultimate issue of custody . . . we will conduct a scrupulous examination of the record . . . *in order to ascertain whether, in light of the totality of the circumstances, the trial court's finding is supported by substantial evidence.*" (Citation omitted; emphasis added.) See also *State* v. *Tomasko*, 238 Conn. 253, 269, 681 A.2d 922 (1996); *State* v. *Lapointe*, supra, 237 Conn. 725. The concern we address today is that in having continued to quote this language, we may have mistakenly suggested that a degree of

deference to the trial court is appropriate on the ultimate question of custody, although such deference would be at odds with the conclusion of the United States Supreme Court in *Keohane*, and our adoption of that conclusion in *Atkinson*.

In spite of our prior use of the "substantial evidence" language, therefore, our approach long has been to conduct a plenary review of the record in order to make an independent determination of custody. Having taken this opportunity to articulate our scope of review with greater clarity, we now turn to the findings of the trial court.

The trial court determined that the defendant was not in custody when he made the inculpatory statements at issue to the polygraph examiners. Our review of the record leads us to the conclusion that the trial court's determination has ample support. The trial court found that the defendant "willingly agreed" to take a polygraph examination on November 16, 1994, although the schedule at the polygraph unit did not allow it at that time. The defendant then agreed to return the following day to take the examination. He was given the option of riding in his own car or with the state police, and he elected to ride with the detectives. Regarding the initial explanation of his rights, the trial court found that it was "most detailed and anything but perfunctory, [that] . . . it was made very clear to him that he could leave at any time that he elected to do so, and that he could stop answering questions anytime he chose on at least three occasions." "He could 'just walk out' of the area where he was and go wherever he chose to go."[28]

[28] The trial court noted that because the defendant did not testify, the court did not have the benefit of hearing his opinions concerning the question of custody during the course of the polygraph examination. Although the defendant cannot be compelled to testify, we note that he had the option to do so without incriminating himself; *Simmons* v. *United States*, 390 U.S. 377, 394, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968); and that his failure to do so leaves us without access to his subjective impressions.

We previously have stated that a fact finder reasonably might find that a reasonable person would feel free to leave when that person was told repeatedly that he could do so. See *State* v. *Greenfield*, 228 Conn. 62, 71 n.10, 634 A.2d 879 (1993) ("an important factor distinguishing a consensual encounter from a seizure is whether the police expressly informed the defendant that he was free to leave at the outset of the interview"); *State* v. *Northrop*, 213 Conn. 405, 415, 568 A.2d 439 (1990) ("[i]t is difficult to conceive of a 'reasonable man' who would not feel free to leave after having been told so many times and in so many ways that he could"). We acknowledge that the defendant was accompanied by one of the examiners while traveling between rooms at the polygraph unit, and, upon asking to use the bathroom, he was taken to the bathroom rather than simply told where to find it. Standing alone, however, these acts do not necessarily rise to the level of a restraint on freedom of movement. Compare *State* v. *Hoeplinger*, supra, 206 Conn. 288 (because defendant arrived at police station covered in blood, and to ensure he did not eliminate evidence, police refused to let him go to bathroom alone or wash his hands; defendant also never informed that he was free to leave). Moreover, when viewed in conjunction with the examiners' repeated statements that he was free to leave, the possibility of an inference of custody is even further reduced. In short, both the words and actions of the examiners would lead a reasonable person to believe he was free to leave the polygraph unit.[29]

---

[29] The defendant emphasizes that he had been driven by detectives to the polygraph unit, which was a "considerable distance from his home." We note that the defendant was given the option of taking his own car to the polygraph unit, and elected instead to drive with Bleidner. As we previously concluded in *State* v. *Northrop*, supra, 213 Conn. 415 n.7, where the defendant also had been driven to the station in a police car and did not have his own transportation there in which to leave, " '[w]hen the individual has not been arrested, a finding of "custody" requires some indication that the officer would not have heeded his or her request to depart.' " No such indication was established in the present case.

Nevertheless, the defendant urges us to conclude that he was in custody by the time he made the inculpatory statements because "[b]y then, the [d]efendant had been subjected to several hours of accusatory interrogation by the police in a hostile environment, had inquired about coming back tomorrow and was told he could not, and had admitted that he had assisted [the victim] in committing suicide, the crime of manslaughter in the second degree." We are unpersuaded. We reaffirm our "concern with protecting defendants against interrogations that take place in a 'police-dominated atmosphere,' containing 'inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely'; *Miranda* v. *Arizona*, supra, 384 U.S. 445, 467 . . . ." *State* v. *DesLaurier*, 230 Conn. 572, 577–78, 646 A.2d 108 (1994). We note, however, that "[a] person, even if a suspect in a crime, is not in custody every time he is asked questions at a police station." *State* v. *Northrop*, supra, 213 Conn. 415. The fact that the defendant had been at the polygraph unit for approximately two and one-half hours when he made the statements at issue does not necessitate the conclusion that a reasonable person would believe he could not leave, particularly in light of the repeated reminders he received that he was free to leave at any time. Compare *State* v. *Hoeplinger*, supra, 206 Conn. 288 (factors leading to finding of custody include that defendant was interrogated for more than thirteen hours and never told that he was free to leave); *State* v. *Ostroski*, supra, 186 Conn. 294 (factors leading to finding of custody include that defendant was interrogated for more than three hours and police repeatedly refused his requests to leave or to stop questioning).

Moreover, we disagree with the defendant's contention that a reasonable person would not feel free to leave after being told that he could not return the next

day to take the polygraph examination. When the defendant asked if he could return the following day, Schaedler accurately explained to the defendant that he would not be able to do so because the appointment schedule at the polygraph unit is normally filled up to six weeks in advance. Although Schaedler did urge the defendant to remain and complete the examination in order to "get it out of the way," he did not suggest or otherwise imply that the defendant could not leave the polygraph unit at that time. Indeed, implicit in Schaedler's statement about when there would next be an opening in the schedule for the defendant to return is the fact that the defendant *could* leave. The only question if he decided to leave would be on what date he next could return. We do not believe that a reasonable person would infer from Schaedler's explanation that he was not free to leave the polygraph unit. Moreover, when viewed in conjunction with the numerous times that the defendant was told explicitly that he could refuse to take the polygraph examination, Schaedler's response to the defendant's inquiry does not compel a finding of custody.

Lastly, the defendant asserts that a reasonable person would not have felt free to leave after having stated that he assisted the victim in committing suicide. The defendant subsequently admitted to Schaedler that the killing was neither a suicide nor an assisted suicide and, shortly thereafter, the interview concluded. At that point, Schaedler offered the defendant the opportunity to smoke a cigarette across the hall, as smoking was not permitted in the polygraph examination room. This offer does not suggest a restraint on movement consistent with custody. To the contrary, it gives the impression that the defendant was still free to move about unrestrained. Although Schaedler suggested they both go across the hall for the defendant to smoke, rather than the defendant traveling alone, there is nothing in

Schaedler's statement to indicate to the defendant that he was not permitted to move about alone. It is also consistent with Palombizio's testimony at the suppression hearing that in past examinations, some examinees have confessed to crimes and nevertheless have been free to leave the unit. "While we agree that admissions of culpability may lead the police either to arrest a suspect or to place restraints on his freedom approximating an arrest, the [polygraph examiners] in this case never altered the circumstances of their interviews of the defendant in such a way that his initial noncustodial status became custodial." *State* v. *Lapointe,* supra, 237 Conn. 727.

It is true that the defendant was taken into custody by Bleidner soon after making that admission. In the circumstances of this case, however, that fact does not compel a finding of antecedent custody. In prior cases, evidence that a suspect left the police station after questioning rather than being arrested, has been considered a supporting factor in concluding that the suspect was not in custody at the time of the questioning. See, e.g., id. (defendant was not in custody where he was allowed to leave station when interview completed); *State* v. *Northrop,* supra, 213 Conn. 414–15 (defendant was not in custody where he and his aunt were driven home from police station after giving statement). Although the act of leaving may, in hindsight, lend credence to a determination that the suspect was actually free to leave during the course of the questioning, the reverse conclusion—that being arrested later somehow proves that the suspect was not free to leave at an earlier time—is not necessarily accurate. See W. LaFave & J. Israel, Criminal Procedure (2d Ed. 1992) § 6.6, p. 320 ("as a matter of logic, it is unsound to say that what happens later has some bearing on how a reasonable person would have perceived the situation at some earlier time"). This is particularly true where, as here, the

officer who later arrested the defendant was not the examiner to whom the inculpatory statements were made.

The trial court's determination that the defendant was free to leave the polygraph unit at any time and, therefore, not in custody, is well supported by the record. In light of the totality of the circumstances, we affirm the decision of the trial court that the defendant was not in custody for *Miranda* purposes when he made the inculpatory statements at issue.

## B

The defendant next argues that his inquiry—"What about a public defender?"—made during the course of his discussion with Palombizio, constituted an unequivocal request for counsel that, pursuant to *Davis* v. *United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994),[30] required the detective to cease questioning him. Alternatively, he contends that the inquiry was at least an equivocal request for counsel that, under article first, § 8, of the Connecticut constitution, requires the police to ask clarifying questions before proceeding. As a threshold matter, any such request necessarily must be made in the context of a *custodial* interrogation in order for the *Miranda* rights to attach. See id. We have concluded in part I A of this opinion that the defendant was not in custody at the time that the inculpatory statements were made. Accordingly, we neither review the equivocality of the request, nor do we reach the defendant's claim that the state constitution requires police to ask clarifying questions where its federal counterpart does not.

---

[30] In *Davis* v. *United States*, supra, 512 U.S. 459, the United States Supreme Court made clear that in order to invoke the *Miranda* right to counsel, the suspect must make an unambiguous request for counsel; hence, an equivocal request need not prompt the police to cease questioning. In the present case, the trial court found that the words constituted an inquiry, not an unequivocal request for counsel under *Davis*.

## C

The defendant's third claim is that the trial court improperly admitted the inculpatory statements because they were not made voluntarily under either the federal or state due process clauses.[31] We disagree.

"[T]he use of an involuntary confession in a criminal trial is a violation of due process. *Mincey* v. *Arizona*, 437 U.S. 385, 398, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978); *Miranda* v. *Arizona*, supra, [384 U.S. 461–63]; *State* v. *DeAngelis*, 200 Conn. 224, 232, 511 A.2d 310 (1986). The state has the burden of proving the voluntariness of the confession by a fair preponderance of the evidence. *Lego* v. *Twomey*, 404 U.S. 477, 489, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972); *State* v. *Schroff*, 206 Conn. 182, 195, 536 A.2d 952 (1988). In *Schroff*, we said: We have stated that the test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . . *Rogers* v. *Richmond*, 365 U.S. 534, 544 [81 S. Ct. 735, 5 L. Ed. 2d 760] (1961). *State* v. *Staples*, [175 Conn. 398, 408, 399 A.2d 1269 (1978)]; see *State* v. *Derrico*, [181 Conn. 151, 163, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980)]. The ultimate test remains . . . Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for

---

[31] The defendant did not argue "before either this court or the trial court, a claim that the state constitution provides criminal defendants with additional protections in determining the voluntariness of a confession. [Accordingly, our] review . . . is limited . . . to a federal constitutional analysis. We note, however, that . . . the state bears the burden of proving the voluntariness of a confession by a preponderance of the evidence under article first, § 8, of the state constitution, as it does under the federal constitution. *State* v. *James*, 237 Conn. 390, 412–26, 678 A.2d 1338 (1996)." *State* v. *Lapointe*, supra, 237 Conn. 702 n.12.

self-determination critically impaired, the use of his confession offends due process. *Schneckloth* v. *Busta-monte*, 412 U.S. 218, 225, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973) . . . . *State* v. *Stankowski*, [184 Conn. 121, 132, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981)]. *State* v. *Derrico*, supra, 161. The determination, by the trial court, whether a confession is voluntary must be grounded upon a consideration of the circumstances surrounding it. *State* v. *Chung*, [202 Conn. 39, 48, 519 A.2d 1175 (1987)]; *State* v. *Carter*, 189 Conn. 611, 622, 458 A.2d 369 (1983); *State* v. *Derrico*, supra, 165." (Internal quotation marks omitted.) *State* v. *Madera*, 210 Conn. 22, 39–40, 554 A.2d 263 (1989).

"Factors that may be taken into account, 'upon a proper factual showing, include: the youth of the accused; his lack of education; his intelligence; the lack of any advice as to his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food and sleep.' . . . [*State* v. *Madera*, 210 Conn. 22, 41, 554 A.2d 263 (1989)]; see also *State* v. *Shifflett*, [199 Conn. 718, 728, 508 A.2d 748 (1986)]. Under the federal constitution, however, 'coercive police activity is a necessary predicate to the finding that a confession is not "voluntary" . . . .' *Colorado* v. *Connelly*, 479 U.S. 157, 167, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986)." *State* v. *James*, 237 Conn. 390, 411, 678 A.2d 1338 (1996).

It is well settled that "[t]he state bears the burden of proving the voluntariness of the defendant's confession by a preponderance of the evidence." *Lego* v. *Twomey*, supra, 404 U.S. 484; *State* v. *Madera*, supra, 210 Conn. 39. As we discussed concerning the scope of our review of the trial court's findings as to custodial interrogation in part I A of this opinion, however, we have noted an ambiguity between the scope of review we actually

have applied to the trial court's findings concerning the voluntariness of a confession, and the language used to describe that scope of review. In this instance as well, therefore, we take the opportunity to clarify the proper scope of appellate review of a trial court's determination of voluntariness. To begin, we note the established rule that "[t]he trial court's findings as to the circumstances surrounding the defendant's interrogation and confession are findings of fact . . . which will not be overturned unless they are clearly erroneous. . . . *State* v. *Atkinson*, supra, 235 Conn. 759." (Internal quotation marks omitted.) *State* v. *Lapointe*, supra, 237 Conn. 728; see also *Miller* v. *Fenton*, 474 U.S. 104, 112, 106 S. Ct. 445, 88 L. Ed. 2d 405 (1985).

As was true concerning appellate review of determinations of custodial interrogation, although we give deference to the trial court concerning these subsidiary factual determinations, such deference is not proper concerning the ultimate legal determination of voluntariness. In its review of state court determinations of voluntariness, the United States Supreme Court long has concluded that "the ultimate question whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution is a matter for independent federal determination." *Miller* v. *Fenton*, supra, 474 U.S. 112; see also *Arizona* v. *Fulminante*, 499 U.S. 279, 287, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991); *Mincey* v. *Arizona*, supra, 437 U.S. 398; *Davis* v. *North Carolina*, 384 U.S. 737, 741–42, 86 S. Ct. 1761, 16 L. Ed. 2d 895 (1966). Consistent with the well established approach taken by the United States Supreme Court, we review the voluntariness of a confession independently, based on our own scrupulous examination of the record. The ambiguity apparent in our prior cases is that, while correctly citing to the relevant federal case law for the proposition that we will conduct an

independent determination of voluntariness; see *State
v. Lapointe,* supra, 237 Conn. 728; *State v. James,* supra,
237 Conn. 411–12; we also have continued to state in
these same cases that "[o]n the ultimate issue of volun-
tariness . . . we will conduct an independent and scru-
pulous examination of the entire record *to ascertain
whether the trial court's finding is supported by sub-
stantial evidence.*" (Emphasis added; internal quota-
tion marks omitted.) *State v. Lapointe,* supra, 728; *State
v. James,* supra, 411.

Our continued use of the "substantial evidence" lan-
guage, when it is inconsistent with the plenary review
that we in fact conduct, perpetuates a misstatement of
the law. We today clarify, therefore, that applying the
proper scope of review to the ultimate issue of voluntar-
iness requires us, not to ascertain whether the trial
court's finding is supported by substantial evidence,
but to conduct a plenary review of the record in order
to make an independent determination of voluntariness.
With this standard of review in mind, we turn to the
findings of the trial court.

The trial court made the following determinations
concerning voluntariness. It noted first that "[t]here's
no doubt in the court's mind [the defendant] understood
what was being said and his answers were clearly
responsive to the questions that were directed to him."
The court went on to address the testimony of the
defendant's expert medical witness, Merikangas, find-
ing that "[t]he important thing for the court to note was
that he didn't mention with any particular degree of
clarity [the defendant's] I.Q., any kind of real mental
disorder. He says [the defendant is] brain damaged and
he qualifies it or quantifies it with a CAT scan pointing
to different areas of the brain that he says are asymmet-
rical and therefore different. And what he really says
is [the defendant is] a dependent personality; easily

influenced. Unfortunately, the flaw in . . . Merikangas' testimony is that he presumed [the defendant] was . . . in custody at this time and not free to leave. And in expressing his opinion about being overborne by the state police, he relies very heavily upon that and that is not the case. . . . In fact, the evidence is all to the contrary about [the defendant] being in custody. He was not in custody at the time. He'd been thoroughly warned of his rights. As far as this court's concerned, there's no doubt in this court's mind he understood exactly what was told to him; he executed the waiver and proceeded to answer the questions. He was twenty years old. Apparently had finished high school. Certainly had a comprehension of the language and understood and could express himself very effectively. As far as the opinion he was overborne is concerned, the court . . . does not find that credible in any sense of the word." Regarding Schaedler's interview tactics after the actual examination was concluded, the trial court determined in its memorandum of decision concerning the motion to suppress that "[t]he primary examiner then confronted [the defendant] using interrogation tactics that are designed to elicit truthful answers. Without a doubt, much of the interrogation technique is premised upon inaccuracies, misstatements and, in some situations, falsehoods. However, if the advisory of rights is accurate, understood and a waiver manifested, questioning techniques are not necessarily subject to review." We affirm the determinations of the trial court.

We begin by addressing the defendant's claims of police coercion. In support of his argument, the defendant contends that the examiners subjected him to the following coercive psychological tactics: stating falsely that the polygraph results would be used against him in court; presenting a fictitious Federal Bureau of Investigation (FBI) profile of the killer that included the view that the killer knew the victim; stating that the victim's

parents had a right to know the circumstances of their son's death; and emphasizing that the defendant would be better off if he told the truth to the examiner. Taken individually and in total, these instances do not constitute police tactics that would preclude a finding of voluntariness.

First, we address the examiner's use of factual misstatements; specifically, the admissibility of polygraph results in court and the existence of a fictitious FBI profile. Schaedler testified extensively at the suppression hearing about how a polygraph examination is properly conducted. Critical to the process is that the examinee is focused on the examination and on the incident in question. The false references to both court admissibility and the FBI profile were made to advance these purposes and to ensure an accurate test result; they were not designed to elicit an admission from the defendant. Even if they had been made with the intention of eliciting an admission, and not for the purposes of conducting an accurate polygraph examination, the statements would not necessarily be impermissible. In *State* v. *Lapointe*, supra, 237 Conn. 731–32, an officer made a false representation to the defendant that his prints were found on the handle of the murder weapon, and such statement was made with the purpose of leading the suspect to believe that the case against him was strong. We concluded that such statements "are common investigative techniques and would rarely, if ever, be sufficient to overbear the defendant's will and to bring about a confession to a serious crime that is not freely self-determined . . . ." Id., 732, and the cases cited therein.

The defendant also takes issue with Schaedler's statements after the polygraph results had been analyzed, first, urging that the defendant should tell the truth because the victim's parents had a right to know how their son died, and second, suggesting that Schaedler

could not help the defendant unless the defendant told the truth. Upon careful review of the record, we conclude that Schaedler's comments did not constitute impermissible promises. "The defendant was given no specific assurances that giving a statement would affect the outcome of the criminal proceedings. Encouraging a suspect to tell the truth . . . does not, as a matter of law, overcome a confessor's will . . . . Neither is a statement that the accused's cooperation will be made known to the court sufficient inducement so as to render a subsequent incriminating statement involuntary. *United States* v. *Ballard*, 586 F.2d 1060, 1063 (5th Cir. 1978). . . . Several courts have held that remarks of the police far more explicitly indicating a defendant's willingness to make a statement would be viewed favorably do not render his confession involuntary. . . . [A] statement [that accused's cooperation would be to his benefit] by a law enforcement officer falls *far* short of creating the compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. . . . . *State* v. *Cydzik*, 60 Wis. 2d 683, 692, 211 N.W.2d 421 (1973) . . . see also *State* v. *Vera*, 701 F.2d 1349, 1364 (11th Cir. 1983) (agent's statement that it would be helpful to sign a confession has been held insufficient by itself to render a confession involuntary); *United States* v. *Morris*, 491 F. Sup. 226, 230 (S.D. Ga. 1980) (agent's comment that if you cooperate, it will go easy on you held not coercive)." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Perry*, 195 Conn. 505, 519–20, 488 A.2d 1256 (1985); see also *State* v. *Chung*, supra, 202 Conn. 55 ("police suggestions that a criminal suspect should cooperate do not, alone, render a confession involuntary"). Taken as a whole, the detective's comments in this regard did not constitute conduct "such as to overbear [the defendant's] will to resist and bring about confessions

not freely self determined." (Internal quotation marks omitted.) *State* v. *Boscarino*, 204 Conn. 714, 740, 529 A.2d 1260 (1987), quoting *Rogers* v. *Richmond*, supra, 365 U.S. 544. We also note that the entire examination process lasted approximately two and one-half hours. Compare *State* v. *Lapointe*, supra, 237 Conn. 734 (eight and three-quarter hour police interview); *State* v. *DeAngelis*, supra, 200 Conn. 233 (ten and one-half hour police interview). In short, "[t]here is no evidence that the police officers who interviewed the defendant induced his admissions with threats or promises, or subjected him to protracted periods of grueling interrogation." *State* v. *Boscarino*, supra, 740.

The defendant also claims that he was susceptible to coercion by the police on account of his age, the existence of psychological impairments, his lack of prior experience with the police, and his emotional state by the conclusion of the interview with Schaedler. The record does not support this claim. The defendant was twenty years old, apparently had completed high school, and was gainfully employed as a car salesman. The defendant's own expert witness testified that he was of normal intelligence. Further, the trial court found that, although the defendant suffered from dependent personality disorder, that did not affect his ability to act freely in the interview. We previously have determined that "the fact that the defendant was somewhat deficient in mental ability, had a psychiatric disorder, and was upset emotionally [does not] necessarily render his statements inadmissible. *State* v. *Jones*, 193 Conn. 70, 84–85, 475 A.2d 1089 (1984) . . . ." (Citation omitted.) *State* v. *DeAngelis*, supra, 200 Conn. 235; see also *State* v. *Lapointe*, supra, 237 Conn. 730 (voluntariness found where victim suffered from dependent personality disorder). Lastly, although the defendant did not have prior experience with the police, the trial court

noted that he seemed to understand fully the explanation of his rights.

The trial court's determinations regarding the voluntariness of the defendant's admissions are well supported by the record. In light of the totality of the circumstances, we affirm the decision of the trial court.

## II

The defendant's final claim is that the trial court deprived the defendant of his right to a fair trial by coercing the jurors into continuing their deliberations over the objections of both the state and the defendant. This claim is without merit.

At 4:30 p.m. on the third day of deliberations, the trial court, having received a written request from the jury, convened the jury in the courtroom and stated: "I have your question, ladies and gentlemen. 'The jury would like to hear, once again, the tape made for us yesterday on the charge of extreme emotional disturbance.' We'll certainly give that to you. We are also going to keep you tonight. We're going to work later. We'll order food for you and give you a choice in about an hour from now as to what you'd like, so with that we'll get this for you. You can hear it up in the deliberation room, and . . . ." At that point, a juror interrupted, asking to make a comment. The trial court asked the jury to return to the deliberation room so that the comment could be written down and delivered to the court. The written note stated: "Prior to a juror requesting to hear tape again, we were going to ask to leave at this time. At least [three] jurors need time to be alone and reflect on their thoughts, without being under the pressure of the other jurors."

Outside the presence of the jury, the trial court heard argument from both the state and defense counsel in support of granting the juror's request that the jury be

sent home for the day. In response to those arguments, the court stated: "I'm concerned about someone who indicates they want to get away from everybody and think about things. Now, this is one of the greatest possibility of contamination occurring. Before you know what happens, [they]'re going to talk to someone about it. 'What do you think of this proposition? What would you do?' Despite the instructions given to them, it's almost inevitable it's going to occur. This practice has occurred many, many times in the past. In fact, it was standard procedure for many, many years. To keep a jury, certainly [9] o'clock is not a late hour, but we'll keep them. I appreciate your concerns. We will keep them." At 5:20 p.m. that day, the jury sent a second note to the court indicating it had reached its verdict.

A jury that is coerced in its deliberations deprives the defendant of his right to a fair trial under the sixth and fourteenth amendments to the federal constitution, and article first, § 8, of the state constitution. "Whether a jury [was] coerced by statements of the trial judge is to be determined by an examination of the record. *Jenkins* v. *United States*, 380 U.S. 445, 446, 85 S. Ct. 1059, 13 L. Ed. 2d 957 [1965]; *Hyde* v. *United States*, 225 U.S. 347, 383, 32 S. Ct. 793, 56 L. Ed. 2d 111 [1912]." *State* v. *Bennett*, 171 Conn. 47, 59, 368 A.2d 184 (1976). The question is whether "in the context and under the circumstances in which the statements were made, the jury [was], actually, or even probably, misled or coerced." *State* v. *Ralls*, 167 Conn. 408, 426, 356 A.2d 147 (1974).

We note at the outset that the defendant does not claim that the trial court coerced the jury into a particular verdict. Instead, he contends, in essence, that the court coerced the jury into rendering a verdict by not permitting it to cease deliberations as requested. Between making its written request and fifty minutes later when it reached a verdict, the jury received no

indication from the trial court whether its request—had it not reached a verdict in the meantime—would be granted. As a result, the only potential source of coercion would be the court's statement to the jury, in advance of its request, that the court would have them continue deliberating that evening. It is important to recognize what this statement does not entail. "At no time did the judge tell the jury, or imply to the jury, that it was required to reach a verdict, [or] that it was required to reach a verdict that night . . . ." *United States* v. *Badolato*, 710 F.2d 1509, 1515 (11th Cir. 1983); see *United States* v. *Pisani*, 773 F.2d 397, 404 (2d Cir. 1985) (no coercion where trial court told jurors on Thursday, third day of deliberations, that they would have to deliberate through weekend if they did not reach verdict by Friday); compare *United States* v. *Assi*, 748 F.2d 62, 68 (2d Cir. 1984) (charge held erroneous where trial court informed jury on first evening of deliberation that if verdict not reached by "10:30 or close to 11:00," jury would be driven home and brought back next day, and stated that " 'It is as simple as that. There has to be a verdict.' "). "The length of time of jury deliberation is a matter of discretion of the trial judge; without more, it cannot constitute coercion." *United States* v. *Caracci*, 446 F.2d 173, 178 (5th Cir.), cert. denied, 404 U.S. 881, 92 S. Ct. 202, 30 L. Ed. 2d 162 (1971). Upon a thorough review of the record, we cannot conclude that the jury was actually or even probably misled or coerced.

In the absence of coercion, the proper standard of review is whether the trial court abused its discretion in not granting the jury's request to be sent home for the day. *United States* v. *Burton*, 894 F.2d 188, 192 (6th Cir. 1990); *United States* v. *Badolato*, supra, 710 F.2d 1515; see also Practice Book § 42-21.[32] In the present

---

[32] Practice Book § 42-21 provides in relevant part: "Jury Deliberations . . .

"The jurors shall be kept together for deliberations as the judicial authority reasonably directs. If the judicial authority permits the jury to recess their

case, both the state and the defendant agreed that the jury's request was reasonable. As a result, the propriety of the trial court's denial of the request is doubtful. Even if the trial court did abuse its discretion, however, the defendant has failed to show that the trial court's action constituted harmful error, particularly in light of the fact that the trial court had not conveyed to the jury that its request to be released for the day had been rejected.

The judgment is affirmed.

In this opinion CALLAHAN, C. J., and BORDEN, PALMER and PETERS, Js., concurred.

BERDON, J., with whom MCDONALD, J., joins,[1] dissenting in part and concurring in part. Although there is much in the majority opinion with which I disagree, I will limit myself to a discussion of three issues. First, I believe it is beyond doubt that the jury's verdict was coerced. Second, I dissent from the majority's determination that the defendant's confession was voluntary. Finally, I concur with the majority's belated acceptance of a standard of review that I suggested three and one-half years ago in dissent. See *State* v. *Atkinson*, 235 Conn. 748, 773, 670 A.2d 276 (1996) (*Berdon, J.*, dissenting) (arguing that "we must make an independent legal determination of whether the defendant was 'in custody' [for purposes of *Miranda*] based upon the facts found by the trial court").

I

A criminal defendant is entitled to a jury verdict that is not coerced. *Lowenfield* v. *Phelps*, 484 U.S. 231, 241, 108 S. Ct. 546, 98 L. Ed. 2d 568 (1988). Jury coercion

---

deliberations, it shall admonish the jury not to discuss the case until they reconvene in the jury room. . . ."

[1] Justice McDonald joins only in part I of this concurring and dissenting opinion.

violates the defendant's right to a fair and impartial trial as guaranteed by the sixth and fourteenth amendments to the federal constitution and article first, § 8, of the state constitution. In my view, the trial court's actions in this case violated the defendant's constitutional rights.

In order to determine whether the trial court's conduct and statements coerced the jury verdict, the entire record must be examined. *Jenkins* v. *United States*, 380 U.S. 445, 446, 85 S. Ct. 1059, 13 L. Ed. 2d 957 (1965); *Hyde* v. *United States*, 225 U.S. 347, 383, 32 S. Ct. 793, 56 L. Ed. 1114 (1912); *State* v. *Stankowski*, 184 Conn. 121, 147, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981); *State* v. *Ralls*, 167 Conn. 408, 421, 356 A.2d 147 (1974).

A critical issue for the jury in this case was whether the defendant, James Pinder, was guilty of intentional murder or manslaughter as a result of being under the influence of extreme emotional disturbance. Substantial medical and psychological testimony was offered by both the defendant and the state as to the defendant's state of mind and his physical problems.

The jurors deliberated over the course of three days. While the jurors never reported a deadlock, their requests and comments suggest that their deliberations were difficult. The jurors initially received instructions on April 11, 1997. On the first day of deliberations, the jury asked for the psychiatric testimony to be read back to it. In addition, the jury requested clarification on the interrogatories for murder and manslaughter verdicts. A question was raised about how extreme emotional disturbance related to the element of intent. After the weekend, on Monday, April 14, 1997, the jury convened for the second day of deliberations. Noting the previous questions from a juror, the trial court reinstructed the jury on the elements of murder and extreme emotional disturbance. Later that same day, the jurors reported

that deliberations were not progressing. In particular, they indicated that there were differences in opinion regarding the conflicting testimony of the psychiatrists. They initially asked the court to clarify its extreme emotional disturbance instruction. Shortly thereafter, the jurors requested reinstructions on extreme emotional disturbance and credibility. On the third day of deliberations, April 15, 1997, jurors requested to hear the tape recordings of the testimony of the psychiatrists. Also upon their request, the jury reheard the instructions on extreme emotional disturbance at 4:30 p.m.

When the trial judge responded to this latest request, he stated: "I have your question, ladies and gentlemen. 'The jury would like to hear, once again, the tape made for us yesterday on the charge of extreme emotional disturbance.' We'll certainly give that to you. We are also going to keep you tonight. We're going to work later. We'll order food for you and give you a choice in about an hour from now as to what you'd like, so with that we'll get this for you. You can hear it up in the deliberation room . . . . A juror, in response, asked "Your Honor, can I make a comment on that?" The judge responded that the jurors should write a note. After returning to the deliberation room, the jurors delivered the following written request to the court: "Prior to a juror requesting to hear tape again, we were going to ask to leave at this time. At least [three] jurors need time to be alone and reflect on their thoughts, without being under the pressure of the other jurors." The jurors' note was delivered at 4:40 p.m. Both the state and defense counsel objected to keeping the jury late. Despite these objections, the trial judge decided not to grant the jurors' request to adjourn for the day[2] because he was concerned about the possibility of jury "contamination," notwithstanding the fact that the note from the jury expressly stated that "[a]t least [three]

---

[2] The trial court never communicated this ruling to the jury.

jurors *need time to be alone* . . . ." (Emphasis added.)[3] Less than one hour later, the jury returned a verdict finding the defendant guilty of murder.

The majority acknowledges that "the propriety of the trial court's denial of the [jury's] request is doubtful." In my view, it is beyond doubt that the trial court's refusal to grant an adjournment coerced the verdict that the jury rendered less than one hour later. The trial court did not respond to the jury's request for a period of forty seven minutes (4:40 p.m. to 5:27 p.m.) after it became known that the jurors wanted to conclude for the evening to reflect on the case. It is reasonable to assume that the jurors understood that their request was denied at 5 p.m., the customary end of the business day. This court has recognized that 5 p.m. is "a time at which, traditionally, juries are excused for the day and in most instances even during their deliberations after a case has been submitted to them . . . ." *State* v. *Ralls*, supra, 167 Conn. 420. Indeed, during the days of deliberation prior to the day the jury delivered its verdict in the present case, they were released before 5 p.m. Their request to stop deliberations was reasonable. By constructively denying their request, the trial judge coerced the jury into reaching a verdict. For all the jurors knew, they would be kept there until midnight if they had not yet reached a verdict.

In *Ralls*, this court held that it is not coercive to keep a jury beyond 5 p.m. Id., 420–26. *Ralls*, however, is distinguishable on the facts. The trial judge requested that the jurors have dinner and continue to deliberate until a verdict was reached. Id., 420–21. In response to this request, however, jurors did not ask to end deliberations. The only juror response was " 'I think it is going

---

[3] The jury began its deliberations on a Friday. Intriguingly, the trial court was unconcerned about the perils of contamination over the two weekend days that intervened before the jury resumed its deliberations on the following Monday.

to be a while,' " which confirmed the need to continue deliberating that day. Id., 421. Significantly, in *Ralls*, our holding that the trial judge did not act coercively depended, in part, upon the fact that there was "no hint as to division." Id., 423. In the present case, in contrast, the jurors explicitly told the trial judge that they needed to end their deliberations for the day because at least three jurors "need[ed] time to be alone and reflect on their thoughts, without being under the pressure of the other jurors."

In sum, the trial court's failure to respond to the jury's request coerced the jury into reaching its verdict. On this basis alone, the defendant's conviction should be reversed.

## II

The defendant also claims that the state failed to prove that his inculpatory statements were voluntary. I continue to believe that the state has the burden to prove beyond a reasonable doubt that a criminal defendant's inculpatory statements were made voluntarily, knowingly and intelligently. *State* v. *Fernandez*, 249 Conn. 913, 733 A.2d 229 (1999) (*Berdon, J.*, dissenting); *State* v. *Lapointe*, 237 Conn. 694, 747, 678 A.2d 942 (*Berdon, J.*, dissenting), cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996); *State* v. *James*, 237 Conn. 390, 453, 678 A.2d 1338 (1996) (*Berdon, J.*, dissenting). I raise this issue of the state's burden because of the majority's emphasis that the state need only prove the voluntariness of a confession by a preponderance of the evidence. In the present case, questions about the defendant's confession arise in the context of police officers' conduct during a polygraph examination. The police officers' questioning of the

defendant and the resulting confession cannot withstand scrutiny through the lens of the heightened standard of proof that should be applied to assess voluntariness.[4]

On appeal, in order to determine whether the defendant's constitutional rights have been violated, we review the record in its entirety. *State* v. *Toste*, 198 Conn. 573, 576, 504 A.2d 1036 (1986). Indeed, we must make an independent and scrupulous examination of the record to determine whether a confession is admissible. *State* v. *Smith*, 200 Conn. 465, 478, 512 A.2d 189 (1986). We do not ask whether the fact finder's decision was clearly erroneous, but rather whether the state has proven that the confession was voluntary. *State* v. *James*, supra, 237 Conn. 445 (*Berdon, J.*, dissenting); *State* v. *Medina*, 228 Conn. 281, 324, 636 A.2d A.2d 351 (1994) (*Berdon, J.*, dissenting); *State* v. *Roman*, 224 Conn. 63, 77, 616 A.2d 266 (1992) (*Berdon, J.*, dissenting), cert. denied, 507 U.S. 1039, 113 S. Ct. 1868, 123 L. Ed. 2d 488 (1993).[5]

The Connecticut constitution provides that "[n]o person shall be compelled to give evidence against himself . . . ." Conn. Const., art. I, § 8. It follows that the state has the burden of proving that a defendant's confession was voluntary. In addition, this court has held that an individual who is not in custody during police questioning "retains the underlying privilege not to incriminate himself and the right to assistance of counsel in support of that privilege." *State* v. *Wilson*, 199 Conn. 417, 444, 513 A.2d 620 (1986). Thus, in addition to proving that there was a voluntary confession, the state must prove that there was a voluntary waiver of a right

[4] Even if a preponderance of the evidence standard were applied, I would still conclude that the confession was not voluntary.

[5] The majority of this court consistently has problems with correctly articulating and applying the appropriate standard of review. See footnote 8 of this dissenting and concurring opinion.

to an attorney. *State* v. *Lapointe,* supra, 237 Conn. 745 (*Berdon, J.,* dissenting).

By continuing to accept this minimal standard when evaluating whether a confession was voluntary, the majority does little to support these constitutional guarantees. Id., 745–48 (*Berdon, J.,* dissenting). By applying a toothless standard of review, the majority turns a blind eye to the fact that admission of a confession into evidence is, in the real world, tantamount to a conviction. Id., 747 (*Berdon, J.,* dissenting); *State* v. *Phinney,* 117 N.H. 145, 147, 370 A.2d 1153 (1977) (acceptance of confession basically amounts to conviction). The United States Supreme Court has recognized that "confessions of guilt, whether coerced or freely given, may be . . . potent evidence." *Lego* v. *Twomey,* 404 U.S. 477, 483, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972). The majority's standard raises serious concerns regarding the fairness of the defendant's murder conviction. This standard also potentially threatens the general public by eroding the foundational premises of our criminal justice system.

Powerful considerations of public policy counsel the adoption of the reasonable doubt standard; these concerns are not adequately addressed by the majority opinion. See, e.g., *State* v. *Lapointe,* supra, 237 Conn. 745–48 (*Berdon, J.,* dissenting); *State* v. *James,* supra, 237 Conn. 445–53 (*Berdon, J.,* dissenting); *State* v. *Stanley,* 223 Conn. 674, 696–703, 613 A.2d 788 (1992) (*Berdon, J.,* dissenting). The necessity of requiring the state to prove the voluntariness of a confession beyond a reasonable doubt—rather than by a mere preponderance of the evidence—reflects society's unwillingness to accept the risk of an erroneous determination in a criminal case. See, e.g., *Lego* v. *Twomey,* supra, 404 U.S. 493 (Brennan, J., dissenting); *State* v. *Lapointe,* supra, 745–46 (*Berdon, J.,* dissenting). Justice Brennan,

in a dissenting opinion, cogently argued that this minimal standard does not sufficiently protect the constitutional privilege against self-incrimination. "If we permit the prosecution to prove by a preponderance of the evidence that a confession was voluntary, then . . . we must be prepared to justify the view that it is no more serious in general to admit involuntary confessions than it is to exclude voluntary confessions. . . . Compelled self-incrimination is so alien to the American sense of justice that I see no way that such a view could ever be justified." *Lego* v. *Twomey*, supra, 494 (Brennan, J., dissenting).

In adopting the reasonable doubt standard, Connecticut would join our enlightened neighbors of the northeast—such as Maine, Massachusetts, New Hampshire, New York, New Jersey and Rhode Island—who currently require a heightened standard of proof in cases involving the voluntariness of a confession. See *State* v. *Collins*, 297 A.2d 620 (Me. 1972) (reasonable doubt); *Commonwealth* v. *Mandile*, 397 Mass. 410, 492 N.E.2d 74 (1986) (same); *State* v. *Benoit*, 126 N.H. 6, 490 A.2d 295 (1985) (same); *State* v. *Franklin*, 52 N.J. 386, 245 A.2d 356 (1968) (same); *People* v. *Huntley*, 15 N.Y.2d 72, 204 N.E.2d 179, 255 N.Y.S.2d 838 (1965) (same); *State* v. *Arpin*, 122 R.I. 643, 410 A.2d 1340 (1980) (clear and convincing).

The facts of the present case underscore the need for the reasonable doubt standard. At trial, James Merikangas, a neurologist and psychiatrist, assessed the effect of the defendant's psychological condition on his ability to make a voluntary confession. Merikangas conducted neurological psychiatric examinations, blood tests, and various scans of the defendant's brain. Merikangas concluded that the defendant's psychological condition is a result of significant brain damage. Even though the defendant has normal intelligence, he

has problems with basic mental and emotional functioning; in particular, he has difficulty controlling his behavior and making independent decisions. According to Merikangas, the defendant's psychological and medical deficiencies were particularly extreme in stressful situations.

C. Scott Grove, a psychiatrist with a specialty in forensic psychiatry, also conducted a general psychiatric evaluation of the defendant at the state's direction. He testified that the defendant suffered from a dependent personality disorder that affected his mental and emotional functioning and described the defendant as pathological.

The defendant and the victim shared a long-term relationship. Their friendship began when they were children and continued into adulthood. Up until the time of the victim's death, they lived together in an apartment in the basement of the victim's family home. There was increasing separation, however, because the victim had recently quit his job at their common employer and had become engaged to be married.

The victim was found shot to death in the early morning hours of November 15, 1994. At the time that the victim's body was discovered, the state police considered both suicide and homicide. The defendant was a subject of the police department's early investigations given his preexisting relationship with the victim. The detectives were concerned with certain evidence and discrepancies that emerged in early interviews.

On November 17, 1994, the defendant, upon request of the state police, submitted to a polygraph examination at the Southbury state police barracks. As a matter of state police policy, police officers read the defendant his *Miranda*[6] warnings early on in the examination. In

___

[6] *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

response to additional questions about whether he was represented by an attorney, the defendant inquired, "What about a public defender?" The defendant was told that the state police did not appoint a public defender at this point in the process. While I am willing to assume that the state attempted to combat the potentially intimidating context of the polygraph examination by giving the defendant *Miranda* warnings, these warnings rang hollow when the defendant attempted to exercise his right to an attorney. At best, the defendant received conflicting messages about his rights.

Throughout his polygraph examination, the police thwarted the defendant's continuing inquiries. During the interview, the defendant inquired into continuing the examination the next day if he felt uncomfortable. The police officers' initial response was that the test could not be conducted the next day. The police emphasized the importance of completing the examination at that time. They added that rescheduling could only take place in emergency situations.

During the several hours that the polygraph examination consumed, the police used interrogation tactics designed to elicit incriminating responses. For example, the police officers made misrepresentations concerning the status of the investigation and the available evidence. The police officers also misstated how the polygraph results might be used against the defendant. After several hours of police questioning, the defendant was confronted with the polygraph results and was accused of committing the murder of his friend. During the examination, the defendant became increasingly emotional and incoherent. Police officers exploited the defendant's emotional vulnerability and his relationship with the victim and the victim's family.

Over the course of the examination, the defendant was subjected to questioning by multiple police officers.

He was placed in two sparsely furnished and windowless interview and polygraph rooms. The polygraph examination took approximately two and one-half to three hours.

For the reasons discussed herein, this case exemplifies the need for the state to prove the voluntariness of a confession beyond a reasonable doubt. The defendant suffers from a psychological disorder and from brain damage characterized by a dependent personality. These infirmities strongly suggest that the defendant's confession was not voluntary under any standard. This conclusion is reinforced by the fact that the mentally disabled defendant was called upon to hold his own during a three hour polygraph examination administered by police officers who were expert in the use of interrogation tactics and who gave him mixed messages concerning his rights under the constitution.

In my view, the trial court erred by declining to suppress the defendant's confession.

## III

I agree with my colleagues in the majority that we must conduct an independent analysis in order to determine whether a defendant was in custody at the time that he incriminated himself. The answer to this question, of course, provides answers to the related questions of whether a defendant was; (1) entitled to receive *Miranda* warnings (which the United States Supreme Court designed to protect citizens from the inherently coercive environment of *custodial* interrogation[7]); and (2) entitled to the cluster of protections associated with the administration of these warnings.

---

[7] "The *Miranda* Court . . . presumed that interrogation in certain custodial circumstances is inherently coercive and held that statements made under those circumstances are inadmissible unless the suspect is specifically informed of his *Miranda* rights and freely decides to forgo those rights." *New York* v. *Quarles*, 467 U.S. 649, 654, 104 S. Ct. 2626, 81 L. Ed. 2d 550 (1984).

In the dissenting opinion that I wrote three and one-half years ago in *State* v. *Atkinson*, supra, 235 Conn. 773, I argued that, "like the [United States] Supreme Court, we must make an *independent* legal determination of whether the defendant was 'in custody' based upon the facts found by the trial court. *Thompson* v. *Keohane*, [516 U.S. 99, 116 S. Ct. 457, 465, 133 L. Ed. 2d 383 (1995)]."[8] (Emphasis added.) At long last, my colleagues in the majority have finally acknowledged the force of my argument. My only regret is that they have done so too late in the day to do justice for the defendants who have suffered the consequences of decisions such as the one in *Atkinson.*

In a closely related matter, I hope that the majority of this court will soon acknowledge the force of my argument that—because a confession is tantamount to a conviction—"our state constitution requires the state to prove two matters beyond a reasonable doubt: (1) the defendant did in fact make a confession; and (2) this confession was made voluntarily, knowingly and intelligently."[9] *State* v. *Fernandez*, supra, 249 Conn. 913

[8] In my dissent in *Atkinson*, I explained that "the language we have used in our cases on this matter has been confusing, if not incorrect. *State* v. *Greenfield*, 228 Conn. 62, 68, 634 A.2d 879 (1993) (At the suppression hearing, the trial court determined that the defendant [was not in custody] at any point prior to his formal arrest. The trial court's determination was a finding of fact that will not be overturned unless it was clearly erroneous.); *State* v. *Ostroski*, 186 Conn. 287, 292, 440 A.2d 984, cert. denied, 459 U.S. 878, 103 S. Ct. 173, 74 L. Ed. 2d 142 (1982) ([w]hether there [is custody] in an individual case is a question of fact); *State* v. *Derrico*, 181 Conn. 151, 158; 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980) ([p]recisely when an arrest occurs is a question of fact)." (Internal quotation marks omitted.) *State* v. *Atkinson*, supra, 235 Conn. 777 n.3 (*Berdon, J.*, dissenting).

[9] "Every state but one in the northeast has adopted a standard of proof in excess of the preponderance of the evidence to determine the voluntariness of a confession." *State* v. *James*, supra, 237 Conn. 452 (*Berdon, J.*, dissenting).

(*Berdon, J.,* dissenting); see also *State* v. *Lapointe,* supra, 237 Conn. 739 (*Berdon, J.,* dissenting).

Accordingly, I dissent in part and concur in part.

MCDONALD, J., concurring in part and dissenting in part. I concur with part I of the majority opinion and dissent from part II of the majority opinion.

## I

As to the defendant's claim that he was denied a fair trial, addressed by the majority in part II of its opinion, I join part I of Justice Berdon's dissent and would order a new trial. As the majority states, "the propriety of the trial court's denial of the [jurors'] request is doubtful." Upon review of the record, I cannot find that the error implicating the constitutional right to trial by jury was harmless beyond a reasonable doubt. See, e.g., *Chapman* v. *California,* 386 U.S. 18, 22–24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967); *State* v. *Webb,* 238 Conn. 389, 482, 680 A.2d 147 (1996); *State* v. *Cavell,* 235 Conn. 711, 720, 670 A.2d 261 (1996).

## II

I concur with part I of the majority opinion. I only wish to add that I would reach the issue of whether the defendant's question, "[w]hat about a public defender," was a request for counsel requiring the police to cease questioning under *Davis* v. *United States,* 512 U.S. 452, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994), and *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The defendant's question was, as the trial court properly found, nothing more than a request for information. Under the circumstances, a reasonable officer objectively could not have understood that the defendant was or might have been invoking the right to counsel. Cf. *State* v. *Anonymous,* 240 Conn. 708, 722–24, 694 A.2d 766 (1997).

In *Davis* v. *United States*, supra, 512 U.S. 458–59, the United States Supreme Court held that, unless a suspect unambiguously requests counsel, the police are not required to stop questioning under *Miranda*. In *Davis*, the court also held that *Miranda* did not require the police to clarify an equivocal request for counsel. Id., 461–62. Without reference to the state constitution, we followed *Davis* in *State* v. *Anonymous*, supra, 240 Conn. 723 & n.16.

The defendant asks this court to add a new layer to *Miranda*, governing the request for counsel under the state constitution. He argues that, pursuant to article first, § 8, of the constitution of Connecticut, police officers should be required to clarify a suspect's equivocal request for counsel. The court in *Miranda*, however, eschewed any federal constitutional basis for the contents of *Miranda* warnings. See, e.g., *Michigan* v. *Tucker*, 417 U.S. 433, 444, 94 S. Ct. 2357, 41 L. Ed. 2d 182 (1974). The United States Supreme Court stated in *Miranda*: "It is impossible for us to foresee the potential alternatives for protecting the privilege which might be devised by Congress or the States in the exercise of their creative rule-making capacities. Therefore we cannot say that the Constitution necessarily requires adherence to any particular solution for the inherent compulsions of the interrogation process as it is presently conducted. Our decision in no way creates a constitutional straitjacket which will handicap sound efforts at reform, nor is it intended to have this effect. We encourage Congress and the States to continue their laudable search for increasingly effective ways of protecting the rights of the individual while promoting efficient enforcement of our criminal laws." *Miranda* v. *Arizona*, supra, 384 U.S. 467.[1]

---

[1] As pointed out in *Davis* v. *United States*, supra, 512 U.S. 462–63 (Scalia, J., concurring), and *United States* v. *Dickerson*, 166 F.3d 667, 671 (4th Cir. 1999), the United States Congress enacted 18 U.S.C. § 3501 with the purpose of overruling *Miranda*. Justice Scalia explained that this provision has not been applied by the courts because the "provision has been studiously

The United States Supreme Court explicitly limits *Miranda*'s dictates to unambiguous requests for counsel to avoid exactly the kind of instant hair splitting analysis and parsing of conversations the defendant would have Connecticut law require. To do otherwise would only lead to the difficulties illustrated by the defendant's argument that this court should conclude that the defendant's question was an unambiguous request for counsel, or, in the alternative, conclude that the question was an equivocal request for counsel requiring the police to clarify the defendant's position. Connecticut police officers should not "be forced to make difficult judgment calls about whether the suspect in fact wants a lawyer even though he has not said so, with the threat of suppression if they guess wrong." *Davis* v. *United States*, supra, 512 U.S. 461.

avoided by every Administration, not only in [the United States Supreme] Court but in the lower courts, since its enactment more than 25 years ago." *Davis* v. *United States*, supra, 464 (Scalia, J., concurring).