STATE OF CONNECTICUT *v.* LEE EDWARDS
(SC 18562)

Rogers, C. J., and Katz, Palmer, McLachlan, Eveleigh and Vertefeuille, Js.

Argued October 20, 2010—officially released January 5, 2011*

* January 5, 2011, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*Glenn W. Falk*, special public defender, for the appellant (defendant).

*Denise B. Smoker*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Sandra Tullius*, former senior assistant state's attorney, for the appellee (state).

*Opinion*

EVELEIGH, J. After a trial before a three judge court,[1] the defendant, Lee Edwards, was convicted of one count each of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (3),[2] assault in the first degree in violation of General Statutes § 53a-59 (a) (3), and risk of injury to a child in violation of General Statutes § 53-21 (a) (1). The defendant was acquitted of a charge of capital felony murder. The defendant appeals[3] from the judgment of conviction, claiming that

---

[1] All references in this opinion to the trial court are to the three judge court, *Blue, Mulcahy* and *Koletsky, Js.*, unless otherwise indicated.

[2] The trial court found the defendant guilty of manslaughter in the first degree as a lesser included offense of the charged crime of murder in violation of General Statutes § 53a-54a.

[3] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

the trial court improperly denied his motion to suppress certain statements that he had made to police detectives prior to his arrest. Specifically, the defendant claims that the trial court improperly permitted the state to introduce into evidence statements that he had made to police because: (1) they were obtained in violation of his rights under *Miranda* v. *Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); and (2) the police were required to videotape the defendant's statements. We reject these claims and, accordingly, we affirm the judgment of the trial court.

The following facts, which the trial court reasonably could have found, and procedural history are relevant to our resolution of the defendant's claims. In late 2002, the defendant began dating D.[4] After one or two months, D moved into the defendant's apartment on Willard Street in Hartford with the victim, who was D's ten month old infant son.[5] In the week prior to his death, the victim had become ill, suffering from a cold and fever, lack of appetite, and pain associated with teething. Although D had made an appointment with a physician to examine the victim, she cancelled that appointment when he appeared to recuperate. On the evening of May 14, 2003, D followed her normal routine and cooked dinner, and then fed and bathed the victim. During the bath, D observed that the victim was not acting as his normal self; instead of being active and laughing, he was lethargic and rested his head on the side of the bathtub, at which point he spit up. D then put the victim to sleep in the apartment's sole bedroom and slept in the living room with the defendant.

[4] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[5] Although D's daughter also initially moved into the defendant's apartment, she later returned to Middletown to live with her grandmother in order to continue attending her prior school.

At approximately 7 a.m. on May 15, the defendant woke D and informed her that the victim needed his diaper changed. D proceeded to clean the victim in the bathroom and then laid him on the bed. The defendant brought a bottle full of apple juice to the victim and told D that she needed to clean the hall closet where she kept the victim's clothes, toys, and other items. D had been at the hall closet less than five minutes when the defendant called out to her that the victim was spitting up. D ran into the bedroom and found the defendant sitting on the bed with the victim, who was face-down over the defendant's knees. D observed the defendant patting the victim on the back as fluid came out of his mouth. D also observed a pair of red and white boxing gloves on the bed. The victim continued to vomit fluid for several minutes, after which D propped him up on the bed. According to D, the victim did not look good; he had become very calm and his eyes were glossy. Although D stated that she wanted to take the victim to a physician or a hospital, the defendant told her that he thought the victim was fine. The defendant persuaded D not to take the victim to the hospital and, instead, asked D to clean up the victim's vomit on the floor.

After D finished cleaning the floor, she returned to the victim and tried speaking with him. The victim did not respond and D observed that the victim was working very hard to breathe. At this point D decided to take the victim to the hospital, and as she dressed herself she also began breathing into the victim's mouth because the victim had ceased breathing on his own.[6] D and the defendant then rushed the victim to nearby

---

[6] Neither D nor the defendant contacted 911. D explained at trial that there was no telephone landline in the apartment and that the defendant, while dressing in the bedroom, had told her that he could not place the call on his cellular telephone because he had no reception, although D testified that the defendant previously had made cellular telephone calls from other areas of the apartment.

Saint Francis Hospital and Medical Center (hospital),[7] where the victim was pronounced dead at 8:59 a.m.[8]

At the hospital, the defendant and D were approached by Laura Buyak and Karla Rodriguez, detectives of the Hartford police department, which had been notified of the victim's death by hospital personnel. The defendant voluntarily agreed to accompany Buyak and Rodriguez to the police station in their police cruiser in order to provide information concerning the victim's death.[9] At the hospital, upon arrival at the station, and during interviews with Buyak and Rodriguez, the defendant repeatedly was told that his presence was voluntary, that he did not have to answer any question that he did not want to, and that he was free to leave at any time.

At the police station, the defendant explained to Buyak the circumstances leading to the victim's death, at one point stating that he had "played rough" with

---

[7] Because neither D nor the defendant owned a car, they intended to walk to the hospital. In the lobby of the defendant's apartment building they came across a neighbor, who telephoned 911 after D informed her that the victim had stopped breathing. When it appeared that the ambulance would take too long to arrive, D and the defendant continued on foot to the hospital, ultimately stopping a passing van whose driver drove them the remaining distance to the emergency room entrance at the hospital.

[8] At trial, Harold Wayne Carver II, the state's chief medical examiner, testified regarding the autopsy that he had performed on the victim. Carver testified that he had found bruises on the victim's stomach, eight fractured ribs, a tear in the victim's liver, lacerations in the victim's left and right adrenal glands, and "a fair amount" of internal bleeding. In his opinion, these injuries were consistent with blunt force trauma, such as being repeatedly hit with "[a] great deal of force" in the stomach. According to Carver, the victim's injuries occurred on two separate occasions. The tears in the liver and right adrenal gland occurred approximately one week prior to the victim's death and could have caused the victim to exhibit a "sort of crummy feeling and lack of appetite" with the possibility of a low level fever. The remaining injuries occurred at or around the time of death, the ultimate cause of the victim's death being multiple blunt force traumatic injuries. On the basis of these findings, Carver classified the victim's death as a homicide.

[9] Before leaving the hospital, D and the defendant signed a consent to search form in order for Hartford police officers to search their apartment. Neither D nor the defendant requested to be present during this search.

the victim, including on the morning of his death.[10] Shortly thereafter, in the presence of Rodriguez, the defendant stated that "he [had] put on some boxing gloves and tapped [the victim] on the stomach a lot. He [had] played rough with [the victim]." With both Buyak and Rodriguez present, the defendant then signed a waiver of rights form and gave a voluntary written statement, wherein he stated that he had been "playing with [the victim], with the boxing gloves on, hitting him in the stomach and ribs [and that he had] hit him several times."

The defendant subsequently was arrested and charged in connection with the victim's death. Prior to trial, the defendant filed a motion to suppress his oral and written statements, claiming that he made those statements while in police custody and before he had been given *Miranda* warnings. On the first day of trial, both parties agreed that, in lieu of a suppression hearing, the state would present evidence and testimony concerning the statements that the defendant sought to suppress, and at the conclusion of the state's case-in-chief the defendant would move to suppress the statements. Pursuant to this agreement, at the conclusion of testimony containing the contested statements, the trial court heard oral arguments from both parties as to whether the defendant had been in custody at the time that he made the statements at issue. The trial court ultimately denied the defendant's motion to suppress. Following the trial, the defendant was convicted of manslaughter in the first degree, assault in the first degree, and risk of injury to a child and was sentenced to a total effective sentence of thirty years incarceration. This appeal followed. Additional facts will be set forth as necessary.

[10] It is the defendant's claim that at this point he should have been advised of his *Miranda* rights and, as a consequence of the failure to so advise the defendant, his subsequent statements should have been suppressed.

I

The defendant first claims that the trial court improperly denied his motion to suppress statements made after his admission that he had "played rough" with the victim, contending that those statements were obtained in violation of his rights under *Miranda* v. *Arizona*, supra, 384 U.S. 478–79. Specifically, the defendant asserts that the motion to suppress should have been granted because under the facts adduced at trial, "[a] reasonable person in the defendant's circumstances would not have felt free to leave the Hartford police station." The state disagrees, claiming that the defendant was not in custody because a reasonable person in the defendant's circumstances would have felt free to leave the police station after repeatedly being told that he was free to leave and that he did not have to answer any questions. We conclude that the trial court properly determined that a reasonable person in the defendant's position would not have believed that he was in police custody when he made his statements to police and, therefore, that the defendant's *Miranda* rights had not yet attached. Accordingly, we conclude that the trial court properly denied the defendant's motion to suppress and permitted the state to introduce the defendant's statements as evidence at trial.

We begin by setting forth the applicable standard of review and governing legal principles. "It is well established that the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self incrimination. *Miranda* v. *Arizona*, [supra, 384 U.S. 444]." (Internal quotation marks omitted.) *State* v. *Canady*, 297 Conn. 322, 335, 998 A.2d 1135 (2010). "As stated by the United States Supreme Court in *California* v. *Beheler*, [463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983)],

[a]lthough the circumstances of each case must certainly influence a determination of whether a suspect is in custody for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. [*Oregon* v. *Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977)]. . . . Further, the United States Supreme Court has adopted an objective, reasonable person test for determining whether a defendant is in custody. . . . Thus, in determining whether *Miranda* rights are required, the only relevant inquiry is whether a reasonable person in the defendant's position would believe that he or she was in police custody of the degree associated with a formal arrest." (Internal quotation marks omitted.) *State* v. *Britton*, 283 Conn. 598, 604, 929 A.2d 312 (2007). In making this claim, "[t]he defendant bears the burden of proving that he was in custody for *Miranda* purposes." (Internal quotation marks omitted.) *State* v. *Kirby*, 280 Conn. 361, 393, 908 A.2d 506 (2006).

"As a general matter, the standard of review for a motion to suppress is well settled. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]hen [however] a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, and the credibility of witnesses is not the primary issue, our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence. . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set [forth] in the memorandum

of decision . . . . [T]he ultimate determination . . . of whether a defendant already in custody has been subjected to interrogation . . . presents a mixed question of law and fact over which our review is plenary, tempered by our scrupulous examination of the record to ascertain whether the findings are supported by substantial evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Canady*, supra, 297 Conn. 336.

In the present case, the defendant claims that the trial court improperly concluded that the defendant was not in custody when he made the additional statements to police, following his initial statement that he had "played rough" with the victim the morning of his death. The defendant does not challenge the trial court's factual findings regarding the circumstances surrounding his questioning. Rather, the defendant claims that, on the basis of the evidence introduced at trial, the trial court improperly concluded that a reasonable person in the defendant's situation would have felt free to leave. "Mindful of the constitutional nature of the claim, we have conducted a scrupulous examination of the transcripts . . . and the trial court's ruling thereon." *State* v. *Britton*, supra, 283 Conn. 605; see also *State* v. *Pinder*, 250 Conn. 385, 411, 736 A.2d 857 (1999) ("[w]e . . . conduct an independent review in light of the totality of the circumstances by scrupulously examining the record to determine if an application of the law to the facts leads us to conclude that the defendant was in custody"). We conclude that the trial court properly determined that the defendant failed to satisfy his burden of proving that he had been in custody when he made the statements at issue.

The following additional facts are relevant to this claim. At approximately 9 a.m. on May 15, 2003, the Hartford police department dispatched Buyak and Rodriguez to the hospital following a report that a deceased infant had been brought to the hospital. After

speaking with fellow officers and physicians, and observing the victim's body, Buyak and Rodriguez spoke with D and the defendant in one of the hospital's family rooms. Buyak and Rodriguez asked D and the defendant if they would accompany them to the police station for interviews in order to assist the detectives in ascertaining the circumstances leading up to the victim's death. Buyak and Rodriguez testified that the police station was a quieter environment within which to conduct the interviews, in comparison to the hectic hospital. At this time, D and the defendant were informed that they were under no obligation to go to the police department and that, once there, they could leave at any time. Buyak and Rodriguez testified that D and the defendant voluntarily agreed to accompany them to the police department around 11 a.m. Although D and the defendant rode in the detectives' cruiser, Buyak and Rodriguez testified that if D or the defendant had owned their own vehicle, they could have driven separately. Buyak explained that the police cruiser was an unmarked vehicle, meaning that it had no roof lights or rear cage for holding suspects, and that passengers could freely open the car doors and exit the vehicle. The defendant and D sat in the rear of the police cruiser and they were not restrained, handcuffed, or searched prior to entering the vehicle. Buyak and Rodriguez sat in the front of the vehicle, and Buyak testified that she kept her weapon, handcuffs, pepper spray, and other police equipment covered during the ride to the police station.

Upon reaching the police station, the defendant and D again were informed that they were free to leave, and Buyak testified that if the defendant had asked to leave the station she would have given him a ride to his destination. At no time while at the police station did the defendant ask to leave. Rodriguez and D proceeded to the only available interview room in the major

crimes section of the station, and Buyak and the defendant went to an available interview room in the youth and family services division, which was separated from the major crimes section by a doorway. Buyak described the defendant's interview room as a "pretty nice size[d] room" with its own attached bathroom.

At the commencement of the interview, Buyak told the defendant that she wanted to know what had happened to the victim. Buyak testified that at this time the defendant was not under arrest and that she did not have any information that would have prompted her to arrest him. Prior to interviewing the defendant, Buyak also: offered him food or a beverage, which he declined; asked if she could take notes, which he agreed to; informed him that he did not have to answer a question if he did not want to; and informed him that he could take a break whenever he wanted. Buyak stated that the defendant had indicated that he wanted to talk to her and that he had no hesitancy in doing so. During the interview, the door to the room remained closed but unlocked, and Buyak was not in possession of her weapon, handcuffs, or other police equipment. At various times, Buyak again offered the defendant food or a beverage, and she reiterated that he did not have to answer her questions if he did not want to.

When questioned about the events that morning leading up to the death of the victim, the defendant stated that the victim had "appeared woozy" when the defendant had entered the bedroom. The defendant explained that he gave water to the victim and, thinking that he needed to be burped, placed the victim on his knees, burped him, and then fluid started coming from the victim's mouth, at which point D reentered the bedroom. The defendant admitted to Buyak that "[h]e probably burped [the victim] too hard," and at another point in the interview, the defendant also stated that he had "played rough" with the victim, including on the morn-

ing of his death. It was at this moment, roughly two hours into the interview, that Buyak decided to take an approximately twenty minute break. Although Buyak stated that she took this break to use the restroom, she also apprised Rodriguez of the status of her interview with the defendant, and on cross-examination she admitted that her decision to take the break had been prompted by the defendant's statement that he had "played rough" with the victim. Buyak testified, however, that the defendant was still free to leave, and that in her absence the defendant remained alone in the interview room with the door open.[11]

Following the break, Rodriguez interviewed the defendant outside Buyak's presence. Rodriguez testified that she had reiterated to the defendant that he was free to leave, that he did not have to answer any of her questions, and that, similar to Buyak, she would ask him questions about what had happened to the victim. Rodriguez testified that at this point the defendant did not wish to leave and that he agreed to speak with her. At some point in the interview, Rodriguez asked whether the defendant would provide in writing that he understood his rights and that he would submit a voluntary statement repeating the details that he had told the detectives. Rodriguez then explained the significance of an untruthful statement, how it would become part of the case file, and she testified that she never told the defendant that he had to provide either of these items.

As Rodriguez was about to leave the interview room to retrieve a waiver of rights form and a laptop computer

---

[11] Rodriguez, who was standing near the doorway, testified that during this break she believed that she had overheard the defendant talking on his cellular telephone, which was in his possession during the course of the interview. Similarly, Buyak testified that she had heard from a fellow officer that the defendant had made a cellular telephone call while he was alone in the interview room.

with which to take the defendant's voluntary statement, the defendant exclaimed that he had forgotten to tell her something and that he needed to speak with Buyak because "he didn't want to seem like a liar . . . ." The defendant explained that he had forgotten to mention that he had "put on some boxing gloves and he tapped [the victim] on his stomach a lot. He played rough with him." Simultaneously, the defendant illustrated his statement by scrunching up his face and making five or six punching motions.[12] Rodriguez then inquired whether the defendant still wished to provide a waiver of rights and a voluntary statement, to which, according to Rodriguez, the defendant replied, "[y]es; that he had nothing to hide." When Rodriguez returned to the interview room with Buyak, the defendant again repeated that he may have struck the victim too hard while boxing.[13] The defendant once more confirmed to the detectives that he wanted to complete a waiver of rights form, which he executed at 2:30 p.m., and that he would provide a voluntary statement, which he did from 2:40 to 3:10 p.m.[14] The defendant was then formally placed under arrest.

---

[12] Rodriguez testified that she was "in shock" at how the defendant's use of the word "tapped" was contradicted by the force he used to illustrate his punches.

[13] At this time the defendant also stated that "he felt that he, he could have caused [the victim's] death in a way," but that "he never killed anybody before," and that "he didn't mean it."

[14] At the conclusion of his voluntary statement, the defendant stated that he did not wish to be left alone in the interview room and Rodriguez requested that Robert Davis, another detective of the Hartford police department, remain with the defendant. Davis testified, however, that he first sat with the defendant at 1:30 p.m., and that he did not see the defendant again until after he had been arrested and Davis escorted him to the booking room. We agree with the state that, regardless of this inconsistency, it is clear from the testimony that the conversation between the defendant and Davis occurred after the defendant had told Buyak that he had "played rough" with the victim. Davis testified that he and the defendant had walked to Davis' desk, located in the major crimes portion of the police station, because the defendant was concerned that D's family members were nearby, including her father. At Davis' desk, they discussed sports and the fact that the defendant had been a boxer for several years. When questioned by Davis

Prior to trial, the defendant filed a motion to suppress the statements that he had made while at the police station. In his motion the defendant asserted that these statements were obtained in violation of his rights guaranteed under the fourth, fifth, and fourteenth amendments to the United States constitution, and article first, §§ 7, 8 and 9, of the Connecticut constitution. After hearing all of the evidence relevant to the defendant's motion to suppress and after both parties presented oral arguments as to whether the defendant had been in custody, the trial court denied the defendant's motion in an oral decision. In its decision, the trial court stated "that there was no custodial interrogation here, because prior to the arrest there was no custody. The defendant was free to leave at any time, and was repeatedly told that he could do so. Traditionally, most courts, including this [one], have defined custody as to whether a reasonable person would believe that he was free to leave under all the circumstances." The trial court found that the defendant had been "told repeatedly, both at the hospital and at the police station, at every step of the way . . . that he was free to leave. He was brought to the police station not handcuffed. And he was brought as a witness . . . . [A]t the police station, he [was] told at every step of the way that he [was] free to leave. He move[d] fairly freely around the police station, he [was] not kept in a locked room.

"He [was] repeatedly told that he [was] free to leave, and under the circumstances, we believe that a reasonable person in his position . . . up to and including

as to what had happened to the victim, the defendant stated that he had been boxing with the victim using thinly padded gloves. When asked to describe the boxing, the defendant first described it as play-fighting, but then as punching. After a brief pause, Davis testified that the defendant then stated that "I punched [the victim] too hard . . . I killed [the victim], but I didn't mean to." After informing his colleagues of the defendant's statements, Davis returned him to the interview room located in the youth and family services division.

the second [written] statement . . . would determine that . . . a reasonable person would feel free to leave."

The defendant's contention that he was in custody and entitled to *Miranda* warnings is foreclosed by *State* v. *Britton*, supra, 283 Conn. 598, and the cases discussed therein, from which this case is legally indistinguishable. See id., 612 (defendant not in custody where he "accompanied the detectives to the police station voluntarily; he was not handcuffed or subjected to force; he was told repeatedly that he was not under arrest and that he could leave at any time; and he was driven home after the interview concluded"); *State* v. *Turner*, 267 Conn. 414, 438, 838 A.2d 947 (defendant not in custody where he voluntarily went to police station, and was told several times that he was not under arrest and that he was free to leave at any time), cert. denied, 543 U.S. 809, 125 S. Ct. 36, 160 L. Ed. 2d 12 (2004); *State* v. *Pinder*, supra, 250 Conn. 397–98 (defendant not in custody during polygraph test, which he took voluntarily, where he had been repeatedly told that he could leave at any time); *State* v. *Atkinson*, 235 Conn. 748, 759–60, 670 A.2d 276 (1996) (defendant not in custody where, inter alia, he voluntarily accompanied officers in unmarked cruiser to station, had not been handcuffed, officers did not display weapons, defendant was told he could stop answering questions and that he would then be driven home, and interview room door had been closed but not locked).

In the present case, Buyak and Rodriguez repeatedly informed the defendant that his presence was voluntary, that he was free to leave the police station at any time, that he did not have to answer their questions, and that he could choose what questions he wanted to answer. The defendant was made aware of these choices at the hospital, upon his arrival at the police station, before and during Buyak's interview of him, and again before Rodriguez interviewed him. The testi-

mony of Buyak and Rodriguez further demonstrates that the circumstances of the defendant's interview do not support his claim that he was in custody prior to the time that he signed the rights waiver form and provided a voluntary statement. Although the detectives drove the defendant to the police station, both testified that the defendant could have driven separately if he had owned a vehicle. Additionally, the defendant rode in an unmarked police cruiser—one without lights or a suspect holding cage—he was not restrained, hand-cuffed, or searched prior to entering the vehicle, and he had the ability to freely open the vehicle's door and exit. At the station, the defendant was interviewed in a "pretty nice size[d] room" with its own attached bath-room, and although Buyak closed the door while inter-viewing the defendant, it remained unlocked. Several times during her interview of the defendant, Buyak offered him food and beverages, and Buyak left the defendant alone in the interview room with the door open for a period of twenty minutes, during which the defendant had access to his cellular telephone and may have placed a call.

The defendant contends that his noncustodial status became custodial when he stated that he had "played rough" with the victim and, as a consequence, the detec-tives viewed him not merely as a witness but as a possi-ble suspect. We previously have concluded that "[a] person, even if a suspect in a crime, is not in custody every time he is asked questions at a police station." *State* v. *Northrop*, 213 Conn. 405, 415, 568 A.2d 439 (1990). This same point was raised by the defendant in *State* v. *Lapointe*, 237 Conn. 694, 727, 678 A.2d 942, cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996), who claimed that "as soon as he implicated himself in the crime in his first statement, his status became custodial because, at that point, no reasonable person would have felt free to leave." This court

rejected such reasoning, concluding that although an "[admission] of culpability may lead the police either to arrest a suspect or to place restraints on his freedom approximating an arrest, the police in this case never altered the circumstances of their interviews of the defendant in such a way that his initial noncustodial status became custodial. The defendant was never physically restrained in any way, was told repeatedly that he could leave, was allowed unrestrained and unaccompanied movement about the police station during his stay and indeed was allowed to leave when the interviews were completed." Id; see also *State* v. *Pinder*, supra, 250 Conn. 415–16 (under facts of case, defendant's statement that he assisted victim in committing suicide did not render his previously noncustodial status custodial).

In the present case, the record demonstrates that the circumstances of the defendant's interview were not altered such that his noncustodial status became custodial when Rodriguez commenced her interview of the defendant after he had admitted to Buyak that he had "played rough" with the victim. First, after the defendant had made this statement, Buyak left him alone in the interview room with the door open for a period of approximately twenty minutes, and Buyak testified that she still considered him free to leave. Second, when Rodriguez began her interview, she once more informed the defendant that he was free to leave, that he did not have to answer any of her questions, at which time the defendant again confirmed that he did not wish to leave and that he would answer her questions. Third, there is no evidence that, during Rodriguez' interview with the defendant, the defendant had been physically restrained or otherwise prevented from terminating the interview and leaving the police station as a result of his statement to Buyak. Fourth, although it is unclear from the record whether during Rodriguez' interview

of the defendant the room door remained closed or had been locked, she testified that she left the interview room door open when she went to find Buyak so that the defendant could mention his omission of using boxing gloves to "[tap]" the victim. Finally, Rodriguez testified that, prior to the defendant signing the waiver of rights form and providing the voluntary statement, if at that point the defendant had expressed a desire to leave, the detectives would have "[l]et him leave. Probably give[n] him a ride." Consequently, a scrupulous review of the record thus fails to reveal any indication that the defendant's earlier noncustodial interview transformed into a custodial one by virtue of the defendant's statement to Buyak that he had "played rough" with the victim.

The dispositive question therefore remains "whether a reasonable person in the defendant's position would believe that he or she was in police custody of the degree associated with a formal arrest." (Internal quotation marks omitted.) *State* v. *Britton*, supra, 283 Conn. 604. "We previously have stated that a fact finder reasonably might find that a reasonable person would feel free to leave when that person was told repeatedly that he could do so. See *State* v. *Greenfield*, 228 Conn. 62, 71 n.10, 634 A.2d 879 (1993) (an important factor distinguishing a consensual encounter from a seizure is whether the police expressly informed the defendant that he was free to leave at the outset of the interview); *State* v. *Northrop*, [supra, 213 Conn. 415] ([i]t is difficult to conceive of a reasonable man who would not feel free to leave after having been told so many times and in so many ways that he could)." (Internal quotation marks omitted.) *State* v. *Britton*, supra, 609. The facts contained in the record amply support the trial court's determination that a reasonable person in the defendant's position would not have believed that he was in custody and, therefore, the police were not required

to read the defendant his *Miranda* warnings after the defendant admitted to Buyak that he had "played rough" with the victim. Accordingly, we conclude that the trial court properly denied the defendant's motion to suppress.

The defendant contends, however, that in light of evidence introduced at trial regarding his mental limitations, this court should incorporate into the existing objective standard a consideration of the defendant's mental impairments, thereby making the question whether a reasonable person *similar to the defendant* would have believed that he was in custody. We decline to do so.

The following additional facts are relevant to this discussion. At some point during Buyak's interview of the defendant, the defendant stated that he received social security checks, although Buyak testified that she did not recall the defendant explaining why he received such checks. During the interview, the defendant also asked Buyak "if murder was [only] with a gun or with a knife," to which she responded "not necessarily." In describing the defendant's demeanor during the interview, Buyak stated that he had appeared fine while they were talking back and forth, but that at some point his demeanor changed and he broke down several times and cried. Buyak further testified that when discussing the events of that morning, the defendant appeared confused and began to change his answers. When likewise asked by Rodriguez to narrate the events of that morning, the defendant requested that she ask him questions so that he could be more truthful. Rodriguez then asked the defendant whether he had any medical conditions, had been taking any medications, or had any other problems, and to each question the defendant replied in the negative.

On several occasions prior to trial, the defendant had been found not competent to stand trial.[15] At trial, the defendant offered the testimony of Madelon Baranoski, a clinical psychologist specializing in forensic psychology, who had performed a psychological evaluation of the defendant.[16] Baranoski testified that the defendant had a full-scale intelligence quotient (IQ) of seventy,[17]

[15] On May 11, 2004, the defendant was found not competent to stand trial but restorable. On November 4, 2004, the defendant was again found not competent and unlikely to be restored under his current treatment regimen and the court, *Mullarkey, J.*, ordered in-patient psychiatric treatment. On December 16, 2004, the defendant was again found not competent and the court, *Mullarkey, J.*, found that involuntary medication of the defendant would restore him to competency, and that no less intrusive means existed to do so. On March 3, 2005, the defendant was found competent to stand trial. On July 19, 2005, however, the defendant was again found not competent to stand trial and the defendant was remanded to the Whiting Forensic Division of Connecticut Valley Hospital (Whiting). On October 17, 2005, the defendant was found not competent to stand trial but restorable and the court, *Mullarkey, J.*, ordered treatment and medication at Whiting. On February 13, 2007, the defendant was found competent to stand trial, although the court, *Mullarkey, J.*, ordered that the defendant remain at Whiting and be transported to and from the courthouse for trial.

[16] The state objects to the defendant's assertion that this court rely on Baranoski's testimony on the grounds that her testimony, part of the defendant's case-in-chief, was not before the trial court when it ruled on the defendant's motion to suppress, and that the defendant had elicited her testimony in order to negate the intent element of capital felony murder and murder, rather than to demonstrate the defendant's ability to comprehend whether he was in custody when he made the contested statements. We do not consider it improper to review Baranoski's testimony because on appeal, in order to determine whether the defendant's constitutional rights have been infringed, "[w]e review the record in its entirety and are not limited to the evidence before the trial court at the time the ruling was made on the motion to suppress." (Internal quotation marks omitted.) *State* v. *Wallace*, 290 Conn. 261, 267, 962 A.2d 781 (2009); see also *State* v. *Toste*, 198 Conn. 573, 576, 504 A.2d 1036 (1986) ("[o]n appeal, in order to determine whether the defendant's constitutional rights have been infringed, we review the record in its entirety and are not limited to the evidence before the trial court at the time the ruling admitting the statements was made").

[17] Baranoski testified that, according to the third edition of the Wechsler Adult Intelligence Scale, the defendant scored seventy-four in the verbal component and seventy-two in the performance component, which combine for a full-scale IQ of seventy. Baranoski explained that scores in the eighty-five to ninety range are "low average," scores below eighty-five are in the borderline and impaired range, and scores below seventy signal some form of mental retardation.

that he had been diagnosed on different occasions with schizophrenia, post-traumatic stress disorder, Tourette syndrome, and dysthymia, and that he displayed " 'in the moment' " behavior, meaning that he would repeatedly perform a task imposed on him and that he was better suited to a structured environment where sequential steps had been laid out for him. Baranoski explained that the defendant's mental limitations meant that he would often only understand "the pieces [of something], but [not] understand the overall of it," and that he would elevate "one characteristic to having far more meaning than it really does, without understanding connections between it."[18] On cross-examination, Baranoski admitted, however, that despite the defendant's mental limitations, he had graduated from high school, maintained an apartment on his own, shopped on his own, fed and clothed himself, dated women, worked, and had been able to stay "out of trouble with the law, with the exception of a couple minor arrests."

In reaching its verdict, the trial court did not specifically reference Baranoski's testimony, although the court stated that intent had been the disputed issue at trial, specifically concerning whether the defendant was guilty of capital felony murder or murder because he had had a conscious objective to cause the victim's death. Finding the defendant not guilty of these two charges, the court concluded that the "[t]he defendant is a man of limited intelligence," and that there was a reasonable doubt whether the defendant, with a conscious objective to cause the victim's death, would have

---

[18] By way of example, Baranoski explained how the fact that the gloves allegedly used to punch the victim were toy gloves held special significance to the defendant. According to Baranoski, the defendant would state: "Well, I put on the gloves because the hand is too hard. So . . . I'm going to wear the toy gloves, as though the toy gloves made the strength of the hand [of] less . . . importance. He identified . . . the aspect of the gloves being bought at Toys 'R' Us and being a toy as more important than the fact that an adult was using them."

punched the victim on May 15, 2003, when the evidence showed that the violent punching of the victim seven to ten days prior to his death had not resulted in any apparent consequences other than flu-like symptoms.

In *State* v. *Turner*, supra, 267 Conn. 439, this court rejected a claim similar to the one the defendant makes herein. In *Turner*, the defendant claimed that the trial court should have used a subjective approach to determine whether he had been in custody on account of "his youth and unfamiliarity with the legal system . . . ." Id. We disagreed, concluding that "when determining whether a reasonable person would have felt that he or she was free to leave, courts are to apply an objective, rather than a subjective, standard. . . . [T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned. . . . Thus, in the present case, it is irrelevant that the defendant may have been a novice to police questioning. His subjective beliefs about whether he was in fact free to leave have no bearing on whether he was in custody for *Miranda* purposes. It is also irrelevant that the defendant was questioned under [the police officer's] assumption, based on the victim's sworn statement, that he had committed the crime. [T]he only relevant inquiry is whether a reasonable person in the defendant's position would believe that he or she was in police custody of the degree associated with a formal arrest." (Citations omitted; internal quotation marks omitted.) Id.

In other instances this court has applied the objective person standard in concluding that a defendant was not in custody, despite evidence of a mental limitation. Thus, for instance, in *State* v. *Pinder*, supra, 250 Conn. 407, the defendant's expert testified that, despite being of normal intelligence, the defendant had "a reduced ability to deal with life' and that under stress, he

[became] dependent on others for the majority of decisions in his life," and that the defendant "suffer[ed] from organic personality disorder with mixed features, including dependence," as a result of a skull fracture received when he was fifteen years old. Id. The state's own expert psychiatrist testified that the defendant had a "dependent personality disorder of mild to moderate intensity." Id., 408. This court, however, applied the objective, reasonable person standard; id., 409; in concluding that the defendant was not in custody when he made inculpatory statements. Id., 412. Similarly, in *State* v. *Lapointe*, supra, 237 Conn. 719–20 and 740 n.2, the defendant's experts testified that although the defendant had an IQ of ninety-two, he suffered from " 'right frontal and posterior cerebral dysfunction' " and dependent personality disorder, which increased his tendency to be compliant, and that he had been diagnosed with Dandy Walker Syndrome, a congenital cranial deformity. The court, however, applied the objective, reasonable person standard and concluded that the totality of the circumstances demonstrated that the defendant had not been in custody when he made inculpatory statements. Id., 726.

In light of our reaffirmation of the objective reasonable person standard set forth in *State* v. *Turner*, supra, 267 Conn. 439–40, and the aforementioned decisions applying this standard in cases where the defendants had varying degrees of mental limitation, we decline the defendant's invitation in the present case to fashion a subjective approach in determining whether a defendant with mental limitations is in custody.[19]

---

[19] Our rejection of the defendant's claim is consistent with the United States Supreme Court's jurisprudence similarly rejecting efforts to incorporate into the objective test for determining whether a defendant had been in custody the subjective aspects of an inquiry into the voluntariness of a defendant's confession. In *Yarborough* v. *Alvarado*, 541 U.S. 652, 666–69, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004), the defendant had claimed that his youth and inexperience with law enforcement were proper considerations in determining whether he was in custody. In rejecting this claim, the United States Supreme Court explained: "There is an important conceptual differ-

## II

The defendant's final claim is that the trial court improperly denied his motion to suppress based on the court's conclusion that videotaping of the defendant's statements was not required. Specifically, the defendant claims that *State* v. *James*, 237 Conn. 390, 429, 678 A.2d 1338 (1996), wherein this court concluded that article first, § 8, of the Connecticut constitution did "not require electronic recording in order for a confession to be admissible at trial," should be limited in scope under the facts of the defendant's case, namely, the "defendant's obvious mental impairments and susceptibility to police influence" and the "virtually unchallengeable police testimony regarding the defendant's supposed punching motions during the unrecorded confession." The defendant's claim, however, is foreclosed by our recent decision in *State* v. *Lockhart*, 298 Conn.

---

ence between the *Miranda* custody test and the line of cases from other contexts considering [subjective aspects of the defendant such as] age and experience. The *Miranda* custody inquiry is an objective test. . . . [O]nce the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry. . . . The objective test furthers the clarity of [*Miranda's*] rule . . . ensuring that the police do not need to make guesses as to [the circumstances] at issue before deciding how they may interrogate the suspect . . . . To be sure, the line between permissible objective facts and impermissible subjective experiences can be indistinct in some cases. It is possible to subsume a subjective factor into an objective test by making the latter more specific in its formulation. . . .

"At the same time, the objective *Miranda* custody inquiry could reasonably be viewed as different from doctrinal tests that depend on the actual mindset [or characteristics] of a particular suspect, where we do consider [characteristics such as] a suspect's age and experience. For example, the voluntariness of a statement is often said to depend on whether the defendant's will was overborne . . . a question that logically can depend on the characteristics of the accused . . . . The characteristics of the accused can include the suspect's age, education, and *intelligence* . . . as well as a suspect's prior experience with law enforcement . . . . [T]he custody inquiry [however] states an objective rule designed to give clear guidance to the police, while consideration of a suspect's individual characteristics—including his age—could be viewed as creating a subjective inquiry." (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 667–68.

537, 542–77, 4 A.3d 1176 (2010), wherein we carefully considered and rejected a similar argument. In *Lockhart*, the defendant claimed that "the United States constitution and the constitution of Connecticut require[d] law enforcement agents to record electronically, whenever feasible, custodial interrogations, *Miranda* warnings and any resulting statements made by the defendant . . . ." Id., 539–40. We disagreed, concluding that article first, §§ 8 and 9, of the constitution of Connecticut did not mandate the recording of custodial interrogations; id., 555; and similarly declining to exercise our supervisory authority to require the recording of custodial interrogations in favor of deferring to the legislature and its determination whether to establish such a recording requirement. Id., 576–77.

The judgment is affirmed.

In this opinion ROGERS, C. J., and McLACHLAN and VERTEFEUILLE, Js., concurred.

PALMER, J., with whom KATZ, J., joins, concurring. As I stated in my concurring opinion in *State* v. *Lockhart*, 298 Conn. 537, 587–88, 4 A.3d 1176 (2010) (*Palmer, J.*, concurring), I believe that this court should adopt a rule, in the exercise of its inherent supervisory authority over the administration of justice, requiring the police to record electronically all police station interrogations of suspects, unless it would not be reasonably feasible for the police to do so in a particular case. I am persuaded that this court should adopt such a rule in view of the fact that, as I explained in *Lockhart*, the reasons militating in favor of such a recording requirement are compelling, whereas the arguments against it are entirely unpersuasive. Id., 588 (*Palmer, J.*, concurring). Because those reasons and arguments are addressed in detail in my concurrence in *Lockhart*, I do not repeat them here. Suffice it to say that recent studies, including

studies of wrongful convictions overturned through the use of DNA evidence, have demonstrated both that the phenomenon of false confessions is significantly more widespread than previously thought and that innocent suspects who falsely confess are invariably convicted. See id., 589–95 (*Palmer, J.,* concurring). "Because a confession constitutes such persuasive evidence of guilt, the value of having a recording of that confession and the interrogation that leads to it cannot be over-stated." Id., 595 (*Palmer, J.,* concurring). Indeed, the recording of confessions "would greatly aid both the trial court and the jury in evaluating the . . . reliability . . . of those confessions" and thereby "dramatically reduce, if not eliminate, any possible likelihood of an erroneous conviction predicated on an involuntary [or false] confession." *State* v. *Lawrence,* 282 Conn. 141, 185, 920 A.2d 236 (2007) (*Palmer, J.,* concurring).

The contention of the defendant, Lee Edwards, in the present case that the police should have recorded the statements that they obtained from him at the police station is particularly compelling in view of the fact that the defendant suffers from both a significant mental impairment, bordering on retardation, and from several, serious psychiatric disorders. With respect to the defendant's mental abilities, trial testimony revealed that the defendant has a full-scale intelligence quotient (IQ) of seventy, that IQ scores below eighty-five are in the borderline and impaired range, and that scores below seventy indicate some form of mental retardation. With respect to the defendant's psychiatric problems, the evidence disclosed that the defendant previously has been diagnosed with schizophrenia, post-traumatic stress disorder, Tourette's syndrome and dysthymia. In fact, the defendant's psychiatric condition was so severe following his arrest in this case that he was found not competent to stand trial on five separate occasions, despite repeated and extensive periods of

inpatient psychiatric treatment and involuntary medication.

It is well established that people with mental illness and mental deficiencies are more prone than others to confess falsely, either because of an inordinate desire to accommodate and agree with authority figures or because they are unable to cope with the psychological intensity of the police interrogation, which frequently includes the use of sophisticated ploys and techniques designed to weaken the suspect's resolve. See, e.g., *State* v. *Lockhart*, supra, 298 Conn. 591–93 and n.9 (*Palmer, J.*, concurring). "Because . . . mentally disabled persons are especially vulnerable to police over-reaching—and because . . . they also are more likely to confess falsely even in the absence of improper government coercion—videotaping confessions by such persons would serve an especially salutary purpose." *State* v. *Lawrence*, supra, 282 Conn. 185 (*Palmer, J.*, concurring).

Particularly because experience has demonstrated that a recording requirement would not adversely affect the way in which the police question suspects or otherwise impair the ability of the police to obtain confessions; see *State* v. *Lockhart*, supra, 298 Conn. 605, 609–16, 619–20 (*Palmer, J.*, concurring); the time has come for this court to impose a recording requirement with respect to police interrogations of suspects that occur at a police station. The benefits to be derived from such a requirement are great, especially in the case of persons who, like the defendant in the present case, suffer from mental disabilities. There is no doubt that the legislature and, perhaps, even the police eventually will see fit to adopt a recording requirement, hopefully sooner rather than later. It is unfortunate, though, that this court remains unwilling to take appropriate action with respect to the recording of confessions despite overriding reason to do so.

Because, however, the recording requirement for which I have advocated was rejected by the majority of this court in *Lockhart*, I am constrained to abide by our holding in that case. Accordingly, I concur in the result.